# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 8, 2016 Session

## SANDRA L. WALLIS v. BRAINERD BAPTIST CHURCH, ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Hamilton County**
**No. 12C765  L. Marie Williams, Judge**

_____

**No. E2015-01827-SC-R11-CV – Filed December 22, 2016**

_____

The plaintiff's husband collapsed and died after participating in a cycling class at a fitness and recreation facility owned and operated by the church. Although the cycling class instructor and others present at the fitness facility attended the plaintiff's husband and called 911 soon after his collapse, they did not utilize the automated external defibrillator ("AED") on site at the facility. The plaintiff filed a wrongful death action against the church, alleging, among other things, that the church had negligently failed to utilize the onsite AED, to train facility personnel on the proper use of the AED, and to comply with applicable state statutes. The church denied negligence and subsequently filed a third-party complaint against the company that sold it the AED, asserting that the seller had contractually agreed to provide a physician oversight program, which, among other things, included oversight of the church's compliance with federal, state, and local regulations. The church alleged that, should the plaintiff recover a judgment against it for failing to comply with statutes, the seller should be solely responsible for the judgment. The plaintiff then filed a second amended complaint naming the seller as a defendant and alleging, as relevant to this interlocutory appeal, that: (1) the seller had negligently breached a duty it owed to her husband and others using the fitness facility to properly maintain the AEDs, to ensure that they were accessible, and to ensure that the church's employees had the knowledge, training, and ability to operate the AEDs; (2) the seller had breached its contract with the church; (3) her husband was a third-party beneficiary of the contract; and (4) the seller's negligence and breaches of contract caused her husband's death, entitling her to recover against the seller on her wrongful death and loss of consortium claims.

The seller moved for summary judgment against the plaintiff and the church, arguing that: (1) it owed no duty of care to the plaintiff or her husband; (2) the church had no common law or statutory duty to acquire or use an AED; (3) neither the plaintiff nor her husband were third-party beneficiaries of the seller's contract with the church; (4) the undisputed facts established that the seller had not breached its contract with the church; and (5) the undisputed facts failed to establish that any of the alleged breaches of contract caused the plaintiff's husband's death. The trial court denied the seller's motion for

summary judgment, concluding that disputes of material fact remained, but it granted the seller permission to seek an interlocutory appeal. The Court of Appeals denied the seller's application for an interlocutory appeal, but this Court granted the seller permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. We conclude that the seller did not owe a duty of care to the plaintiff's husband or other users of the fitness facility independent of its contract with the church and that the church had no statutory or common law duty to acquire or use the AED it purchased from the seller, and as a result, the plaintiff's husband was not a third-party beneficiary of the church's contract with the seller. For these reasons, the seller is entitled to summary judgment on the plaintiff's second amended complaint and the church's third-party complaint. Accordingly, we reverse the judgment of the trial court and remand for entry of summary judgment in favor of the seller on all claims and for any other necessary and appropriate proceedings consistent with this decision.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Trial Court Reversed and Case Remanded**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Daniel M. Stefaniuk and James H. Payne, Chattanooga, Tennessee, for the appellant, ExtendLife, Inc.

David E. Harrison and Thomas M. Gautreaux, Chattanooga, Tennessee, for the appellee, Sandra L. Wallis.

Alaric A. Henry, Elizabeth L. Epps, and Amanda B. Dunn, Chattanooga, Tennessee, for the appellees, Brainerd Baptist Church and David Manuel Rojas.

## OPINION

### I. Factual and Procedural History

The defendant, Brainerd Baptist Church (the "Church"), owns and operates a fitness and recreation facility, Brainerd Crossroads or BX ("BX"), in Hamilton County, Tennessee. On August 21, 2008, the Church purchased four (4) automated external

defibrillators (collectively "AEDs")[1] from ExtendLife, Inc. ("ExtendLife").  At least one of these AEDs was placed at BX.  The terms of the Church's contract with ExtendLife were described in an August 11, 2008 email from a sales employee for ExtendLife to an associate pastor of the Church, who also then served as director of BX.  By an August 20, 2008 email from the BX director to ExtendLife's sales employee, the Church accepted and confirmed the contract terms.  And, in an August 21, 2008 email, ExtendLife's sales employee acknowledged the Church's acceptance of the contract terms, advised that the order would be processed that same morning, and indicated that the AEDs would be delivered in a couple of business days.

The order was, in fact, processed by invoice number 809001, dated August 21, 2008, and this invoice, consistent with the email exchange, reflected that the Church had purchased four AEDs and also had purchased, at a cost of $150 per AED, what was referred to as "Annual Physician Oversight Program Management."   Although the invoice included no further description of this program, the August 11, 2008 email from ExtendLife's sales employee to the BX director included the following outline of the services provided by the Physician Oversight Program Management System:

> 1. Physician's prescription for purchase of AED (standing order).
>
> 2. Medical oversight and written emergency plan, as required by state law.
>
> 3. Evaluation of employee/responder recertification schedules.
>
> 4. Monitors expiration of AED batteries and electrode pads.

---

[1] A Tennessee statute defines "'[a]utomated external defibrillator" as:

a medical device heart monitor and defibrillator that:

(A) [h]as received approval of its premarket notification, filed pursuant to 21 U.S.C. [section] 360(R), from the United States food and drug administration;

(B) [i]s capable of recognizing the presence or absence of ventricular fibrillation or rapid ventricular tachycardia, and is capable of determining, without intervention by an operator, whether defibrillation should be performed; and

(C) [u]pon determining that defibrillation should be performed, automatically charges and requests delivery of an electrical impulse to an individual's heart.

Tenn. Code Ann. § 68-140-402(2) (2013).

5. Monitors scheduled AED maintenance checks.

6. Notifications for the expiration dates of responder certifications, batteries, and electrode pads.

7. Local EMS registration AED locations.

8. Post event review and analysis of ECG data by a physician and reports filed with appropriate government agencies.

9. 24-hour customer support.

10. Post-event physician consultation, if requested.

11. Physician phone consultation regarding any medically-specific aspect of your program.

The August 21, 2008 invoice, like the August 11, 2008 email, also reflected that ExtendLife would provide the Church with four complimentary training classes for up to twenty participants per class, and each participant completing a training class would receive CPR, AED, and Emergency Oxygen Administration certifications. Two of these complimentary training classes were held in March 2009, and the third was held in April 2009. Seventeen persons attended these classes. The fourth class was scheduled for May 2009, but only one person signed up for this class and elected not to take it alone, so this final complimentary class was canceled. The Church did not order additional training services from ExtendLife and instead hired Mr. Chris Fryar, a Church member and fire department captain, to provide AED training to BX personnel.

In January 2011, more than two years after the Church purchased the AEDs from ExtendLife, the plaintiff, Sandra Wallis, and her deceased husband, Jerry Wallis, became members of BX. On August 20, 2011, Mr. Wallis participated in an indoor cycling class at BX. After exiting the cycling room, Mr. Wallis collapsed. As soon as she was told of his collapse, the cycling class instructor, Kelly Casey, went immediately to his location. Ms. Casey had been trained by Mr. Fryar and had American Heart Association AED training and certification and CPR certification.[2]

When Ms. Casey arrived, she observed Mr. Wallis lying on the floor on his side, his body rigid, his eyes open, and his head lifted off the floor. Ms. Casey heard him breathing and saw his chest rising and falling, and after checking his wrist, she determined that he had a pulse. Based on Mr. Wallis's physical condition—breathing, eyes open, head lifted off the floor, and body rigid—Ms. Casey believed Mr. Wallis was

---

[2] According to the Church, Ms. Casey was an independent contractor paid by the Church on a per class basis.

having a seizure, not a coronary event, and she placed towels beneath his head for support. She decided to wet more towels to cool Mr. Wallis, and as she was heading to the water fountain across the room, she encountered two men, both off-duty police personnel, who had just finished a meeting at BX. One of the men asked if BX had an AED, and if so, where it was located. Ms. Casey walked him to the nearest AED, located outside the aerobics room, and after they retrieved it, she returned with him to Mr. Wallis's location.[3] The man remained with Mr. Wallis while she continued to the water fountain across the room to wet the towels, and the two men assumed control of Mr. Wallis's care. When Ms. Casey returned to Mr. Wallis's location approximately forty-five seconds later, one of the men asked for someone to go outside, await the ambulance, and direct the paramedics to Mr. Wallis's location, so Ms. Casey did so. Soon thereafter, paramedics arrived, assumed responsibility for Mr. Wallis's care, and transported him to the hospital, but he died. It is undisputed that no one who received training in the complimentary classes ExtendLife provided in 2009 was present at BX when Mr. Wallis collapsed in 2011 and that, although the AED located at BX was brought to Mr. Wallis's location, it was not deployed.

On June 21, 2012, Mrs. Wallis filed suit against the Church, and she later amended her complaint to name, as an additional defendant, David Manuel Rojas, director of BX at the time of her husband's collapse.[4] Mrs. Wallis asserted claims of negligence and negligence per se. With respect to her negligence claim, Mrs. Wallis alleged that the Church owed a duty to those using BX, including Mr. Wallis, to maintain a reasonably safe facility, and this duty obligated the Church to ensure that BX personnel were properly trained in the use of the AEDs. Mrs. Wallis further contended that the Church owed a duty to use its AED on Mr. Wallis on August 20, 2011; that it breached this duty; and that this breach caused Mr. Wallis's death. With respect to her negligence per se claim, Mrs. Wallis alleged that the Church violated certain provisions of Tennessee's AED statutes, specifically Tennessee Code Annotated sections 68-140-403, -404, and -408, and that these violations caused Mr. Wallis's death.

In its answer to the amended complaint, the Church denied negligence but also alleged that it had entered into a contractual agreement with ExtendLife, which obligated ExtendLife to "maintain [a] physician oversight program of the training and facilities" and to "oversee all compliance with federal, state, and local regulations regarding the use of AED[s]." The Church asserted that ExtendLife's obligations under the physician oversight program were described in an enclosure ExtendLife included with a letter ExtendLife sent the Church in April 2012, about eight months after Mr. Wallis's collapse. The enclosure, titled "AED Medical Direction-Physician Oversight Program," stated:

---

[3] Although Ms. Casey knew of the AED, retrieving it earlier had not occurred to her because she believed, based on Mr. Wallis's breathing and pulse, that he had suffered a seizure not a coronary event.

[4] Mr. Rojas is sued in his capacity as a church employee and director of BX. Unless the context demands otherwise, the Church and Mr. Rojas are collectively referred to herein as the Church.

Federal and state laws govern workplace defibrillation programs. Medical Direction, or physician oversight, is essential to a successful AED program, and is required by most states. It is also recommended by OSHA, the American Heart Association®, and state-county EMS. We manage the intricacies of your defibrillation program so that you can manage your business. With our system, ExtendLife's network of partnering physicians and medical professionals:

1. Provide initial physician's prescription for the AED purchase *(FDA requirement)*.

2. Oversee compliance with federal, state, and local regulations regarding AEDs.

3. Monitor and advise you of ongoing changes in AED legislation.

4. Provide EMS registration for all AED locations and updates as needed *(state requirement)*.

5. Establish written protocols for AED use by site rescuers *(state requirement)*.

6. Establish equipment maintenance plan according to the manufacturer's user guide and provide for a system under which any legally required records are kept *(state requirement)*.

7. Monitor and advise you of expiration of critical lifesaving parts and accessories (electrodes, batteries, etc.), through email notification.

8. Oversee that all site rescuers are properly trained and their skills are properly maintained *(state requirement)*, through email notification.

9. Provide post-incident analysis of downloaded rescue data (ECG), debriefing of your participating rescuers, and the submission of completed incident reports to appropriate government agency or agencies as required by law, such as your county EMS provider *(state requirement)*.

10. Provide free loaner AEDs during post-event reviews and ECG data evaluations.

11. Offer 24-hour toll-free program service and support.

On November 8, 2012, the Church sought and later received[5] permission to file a third-party complaint against ExtendLife. In its third-party complaint, the Church reiterated its reliance on the 2012 enclosure describing the "AED Medical Direction-Physician Oversight Program."[6] The Church alleged that any failure on its part to comply with Tennessee's AED statutes would be the result of ExtendLife's breach of contract and any judgment Mrs. Wallis obtained against the Church for failing to comply with these statutes should be the sole responsibility of ExtendLife. The Church also sought indemnification from ExtendLife for all attorneys' fees and expenses it incurred in defending against Mrs. Wallis's lawsuit. Also on November 8, 2012, the Church filed a motion for summary judgment against Mrs. Wallis, relying on the waiver and release Mr. Wallis signed when he joined BX and arguing that the AED statutes do not afford a private cause of action.

On November 19, 2012, Mrs. Wallis filed a second amended complaint, naming ExtendLife as a defendant in addition to the Church, and asserting a direct negligence claim and a third-party beneficiary breach of contract claim. With respect to the direct negligence claim, Mrs. Wallis alleged that ExtendLife owed a duty to Mr. Wallis and other patrons of BX to properly maintain the AEDs, to ensure that the AEDs were accessible, and to ensure that the Church's employees and agents at BX were properly trained to operate the AEDs. Mrs. Wallis alleged that ExtendLife had breached its duty by failing to properly train the Church's employees and agents in the use of AEDs and

---

[5] The trial court granted the Church's motion to file its third-party complaint on November 20, 2012, and the complaint was stamped filed on December 4, 2012.

[6] The record on appeal reflects that the Church paid for the annual physician oversight program for the period August 21, 2008-August 20, 2009, pursuant to the August 21, 2008 invoice, number 809001. ExtendLife apparently did not bill the Church for this program for the period August 21, 2009-August 20, 2010, but again billed, and the Church again paid, for this program for the period August 21, 2010-August 20, 2011, pursuant to an invoice dated June 17, 2010. ExtendLife failed to bill the Church for this program for the period August 21, 2011-August 20, 2012. After Mr. Wallis's collapse and death, and without receiving notice from the Church about the incident, ExtendLife agreed to provide the program free of charge to the Church for a period of two years. ExtendLife sent the Church a letter in April 2012 memorializing this agreement and included the enclosure titled "AED Medical Direction-Physician Oversight Program." The Church and ExtendLife disagree about whether the physician oversight program described in the August 11, 2008 email from ExtendLife's sales employee to the BX director and the program described in the 2012 enclosure imposed the same obligations on ExtendLife, and they also disagree about which of these programs governed at the time of Mr. Wallis's collapse. However, these factual disputes are not material to the dispositive issue in this interlocutory appeal, which is whether the Church owed a duty to Mr. Wallis to acquire the AED, to make it available for use, and to use it on Mr. Wallis. See Rye v. Women's Care Ctr. Of Memphis, MPLLC, 477 S.W.3d 235, 251 (Tenn. 2015) (explaining that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" and stating that "disputes that are irrelevant or unnecessary will not be counted" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))). We conclude that the Church did not owe this duty. Therefore, regardless of disputes about its precise terms, the Church's contract with ExtendLife was not intended to satisfy a duty the Church owed to Mr. Wallis, so Mrs. Wallis's third-party beneficiary claim again ExtendLife cannot succeed.

that this breach caused Mr. Wallis's death. With respect to her third-party beneficiary claim, Mrs. Wallis alleged that the contract obligated ExtendLife to ensure that the Church complied with all federal, state, and local regulations regarding AEDs and to ensure that the Church's employees and agents were properly trained in the use of AEDs. She asserted that ExtendLife had failed to perform these contractual obligations, that Mr. Wallis was a third-party beneficiary of the contract, and that ExtendLife's breach of contract caused Mr. Wallis's death.

On January 17, 2013, ExtendLife filed its answer to Mrs. Wallis's second amended complaint and to the Church's third-party complaint. ExtendLife denied owing a duty to Mr. Wallis, denied that the Church owed a duty to Mr. Wallis, denied breaching any alleged duty, and denied that any act or omission on its part caused Mr. Wallis's death. ExtendLife further denied that Mr. Wallis was a third-party beneficiary of its contract with the Church, denied breaching that contract, and denied that any of the alleged breaches caused Mr. Wallis's death.

On February 13, 2013, the trial court denied in its entirety the Church's motion for summary judgment against Mrs. Wallis, but nine months later, the Church filed a motion to reconsider the denial of summary judgment on Mrs. Wallis's negligence per se claim. On January 17, 2014, the trial court granted reconsideration and also granted the Church partial summary judgment, dismissing Mrs. Wallis's negligence per se claim, concluding that the AED statutes do not afford a private right of action.

Subsequently, on September 23, 2014, ExtendLife filed a motion for summary judgment, seeking dismissal of Mrs. Willis's second amended complaint and the Church's third-party complaint. ExtendLife argued, in pertinent part, that it owed no duty to Mr. or Mrs. Wallis and that, because the Church owed no duty to Mr. Wallis to acquire or use an AED, Mr. Wallis was not a third-party beneficiary of the contract. ExtendLife also denied breaching its contract with the Church, and alternatively, argued that none of the alleged breaches caused Mr. Wallis's death.

On November 3, 2014, the Church filed a motion for summary judgment as to Mrs. Wallis's remaining claims against it and adopted those portions of ExtendLife's brief asserting that the Church owed no duty to Mr. Wallis regarding the AEDs. However, on November 19, 2014, the Church also filed a response in opposition to ExtendLife's motion for summary judgment as to the Church's third-party complaint. And, on December 4, 2014, Mrs. Wallis filed responses in opposition to both ExtendLife's and the Church's motions for summary judgment.

By an order entered April 17, 2015, the trial court denied both motions for summary judgment, concluding that numerous disputes of material fact remained concerning the relationships between the parties and the transaction between the Church and ExtendLife.

On May 18, 2015, ExtendLife asked the trial court to grant it an interlocutory appeal. And, on May 29, 2015, the Church also sought permission to seek an interlocutory appeal but simply adopted ExtendLife's motion as grounds for its request.

On July 10, 2015, the trial court granted ExtendLife's motion for an interlocutory appeal[7] but denied the Church's motion as untimely. Tenn. R. App. P. 9(b) ("The party seeking an appeal must file and serve a motion requesting such relief within 30 days after the date of entry of the order appealed from."). The Court of Appeals declined to grant ExtendLife's application for an interlocutory appeal. Thereafter, this Court granted ExtendLife permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure in this Court.

## II. Standards of Review

This is an appeal from the trial court's denial of Extendlife's motion for summary judgment. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997); see also Abshure v. Methodist Healthcare-Memphis Hosp., 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. The following standards guide our de novo review:

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the

---

[7] The trial court entered an amended order on September 16, 2015, to correct its July order that had erroneously referred to ExtendLife as the manufacturer rather than the seller of the AEDs. Quotations herein are taken from the September 16, 2015 order.

record." Id. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co.[v. Zenith Radio Co.], 475 U.S. [574,] 586, 106 S.Ct. 1348[, 89 L.Ed.2d 538 (1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

Rye v. Women's Care Ctr. of Memphis, MPLLC, 477 S.W.3d 235, 264-65 (Tenn. 2015) (alterations in original and added); see also Am. Heritage Apartments, Inc. v. Hamilton Cnty. Water and Wastewater Treatment Auth., 494 S.W.3d 31, 39-40 (Tenn. 2016) (explaining that the Rye standards apply in lawsuits, like this one, that were commenced after July 1, 2011, the date the standards set forth in Tennessee Code Annotated section 20-16-101 became effective).

## III. Analysis

### A. *Issues on Appeal*

The scope of review in this interlocutory appeal is narrow. Sneed v. City of Red Bank, 459 S.W.3d 17, 22 (Tenn. 2014). As we recently explained,

Unlike an appeal as of right under Tennessee Rule of Appellate Procedure 3, in which both the appellant and the appellee have broad latitude with regard to the issues that may be raised, the questions this

Court may address when considering an interlocutory appeal are limited to those matters clearly embraced within the issues certified in the orders of the trial court and the intermediate appellate court.

Id. (citations and internal quotation marks omitted); see also Young v. City of LaFollette, 479 S.W.3d 785, 789 (Tenn. 2015). Where, as here, the intermediate appellate court denies permission to pursue an interlocutory appeal, our review is limited to the issues certified by the trial court and matters clearly embraced within those issues. Here, the trial court certified the following three issues:

> 1. Whether the seller of an automated external defibrillator ("AED") owes or retains a duty to a third party allegedly injured by [the] failure of the owner to implement the AED under the circumstances of this case.
>
> 2. Whether the contract of sale of the AED at issue creates a certain obligation on the seller to provide the owner's employees with proper training to recognize and respond to situations in which an AED may be used.
>
> 3. (a) Whether a user of the owner's premises constitutes a third-party beneficiary of an alleged contract between a seller and an owner of an AED requiring the seller to provide training to the owner's employees to recognize and respond to situations in which an AED may be used.
>
> (b) Whether a duty to a third party arises out of the contract from an alleged failure of a seller to provide such training.

Our review is thus limited to the foregoing issues or matters clearly embraced therein.[8]

Reiterating the limitations on our scope of review in this interlocutory appeal is necessary because, in her brief before this Court, Mrs. Wallis has attempted to reframe the legal issues. A review of the record reveals that Mrs. Wallis's legal position has been fluid and evolving throughout this litigation. When she initiated the action against ExtendLife in her second amended complaint, she asserted two claims—a direct negligence claim and a third-party beneficiary claim. However, in both her response to

---

[8] In the order granting ExtendLife's application, we directed the parties to address the following issue, in addition to those issues certified by the trial court: "[W]hether the Court should adopt the Restatement (Third) of Torts: [Physical] [and] Emotional Harm [section] 40." Wallis v. Brainerd Baptist Church et al., No. E2015-01827-SC-R11-CV (Tenn. Feb. 19, 2016) (order granting the application and specifying an additional issue for the parties to brief and argue). Upon further consideration, and because third-party beneficiary status is determined at the time of contracting, which was in 2008, we have decided not to address this additional issue.

ExtendLife's motion for summary judgment and in her response to interrogatories,[9] Mrs. Wallis relied exclusively on her third-party beneficiary claim. And again in the response she filed in the Court of Appeals to ExtendLife's application for interlocutory appeal, Mrs. Wallis advanced only her third-party beneficiary claim.[10] Likewise, in her response to ExtendLife's application for permission to appeal in this Court, Mrs. Wallis reiterated that her claim against ExtendLife arose from its alleged breaches of its contract with the Church.

However, in her supplemental brief in this Court, Mrs. Wallis attempts what appears to be a complete course reversal by seeking to reframe the issues, disavow her third-party beneficiary claim, and rely exclusively upon her direct negligence claim.[11]

---

[9] In her response to ExtendLife's summary judgment motion, Mrs. Wallis explained her position as follows:

In other words, ExtendLife agreed, and therefore had a duty, to provide [the Church] with those products, services, and training sessions that would permit a BX employee to properly recognize and respond to a medical emergency requiring the use of an AED. Indeed, this was the very purpose of the Agreement [between ExtendLife and the Church]. In light of this purpose, and as discussed later in this [b]rief, ExtendLife's duty extended to BX's customers, as ExtendLife's express purpose in providing these products and services was for the benefit and protection of any BX employee, customer, or other individual in BX's facility that might experience a medical emergency requiring the use of an AED.

Her response also included the following statement, "Pursuant to the terms and purpose of [its contract with the Church], ExtendLife had a duty . . . ."

In responses to ExtendLife's interrogatories, Mrs. Wallis again contended that ExtendLife's duty to Mr. Wallis arose from its contract with the Church and was based on Mr. Wallis's status as a third-party beneficiary of that contract.

[10] Mrs. Wallis's response in the Court of Appeals explained her position as follows:

[Mrs. Wallis] contends that, pursuant to an agreement between ExtendLife and [the Church], ExtendLife had a duty to provide BX with those products, services, and training sessions that were necessary for a BX employee to recognize and respond to medical emergencies requiring the use of an AED. . . . The actual issues are whether ExtendLife fulfilled its duties to BX and consequently, the users of BX's premises.

[11] Admittedly, Mrs. Wallis continues to refer to ExtendLife's breach of its contract with the Church in her supplemental brief, but she also refers to ExtendLife's duty to Mr. Wallis under section 324A of the Restatement (Second) of Torts. Nevertheless, at oral argument before this Court, Mrs. Wallis's counsel stated clearly that Mrs. Wallis's claim was based upon ExtendLife directly owing a duty to Mr. Wallis pursuant to section 324A of the Restatement (Second) of Torts and that the third-party beneficiary claim was not at issue in this appeal.

She does so by invoking section 324A of the Restatement (Second) of Torts for the first time in this lawsuit.[12]

We decline to accept Mrs. Wallis's invitation to reframe the issues in this manner. Doing so would contravene the principle, already explained, that the scope of review in interlocutory appeals is limited to the issues certified by the trial court and to matters embraced within those issues. Although the first certified question appears broad enough to embrace Mrs. Wallis's direct negligence claim, Mrs. Wallis has not previously relied upon section 324A of the Restatement (Second) of Torts to support her direct negligence claim against ExtendLife. Permitting her to rely upon this theory would therefore be inconsistent with the well-settled principle that "issues not raised in the trial court cannot be raised for the first time on appeal." Simpson v. Frontier Cmty. Credit Union, 810 S.W.2d 147, 153 (Tenn. 1991); see also Dye v. Witco Corp., 216 S.W.3d 317, 321 (Tenn. 2007) (holding that "issues raised for the first time on appeal are waived" (quoting Black v. Blount, 938 S.W.2d 394, 403 (Tenn. 1996))). Nevertheless, our conclusion, explained hereinafter, that the Church had no duty to acquire an AED, make it available for use, or use it also is fatal to Mrs. Wallis's direct negligence claim under section 324A. Because the Church owed no duty to Mrs. Wallis's husband, ExtendLife did not undertake any duty on behalf of the Church that would subject ExtendLife to liability under section 324A.

---

[12] Section 324A of the Restatement (Second) of Torts, titled "Liability to Third Person for Negligent Performance of Undertaking," provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

This Court has previously cited section 324A(b) approvingly. See Biscan v. Brown, 160 S.W.3d 462, 483 (Tenn. 2005).

## B. Plaintiff's Third-Party Beneficiary Claim

"A contract is an agreement between two or more persons that creates obligations that are legally enforceable by the contracting parties." West v. Shelby Cnty. Healthcare Corp., 459 S.W.3d 33, 46 (Tenn. 2014) (citing General Am. Life Ins. Co. v. Armstrong, 185 S.W.2d 505, 507 (Tenn. 1945); Hillsboro Plaza Enters. v. Moon, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993)). A contract is presumed to be executed for the benefit of the contracting parties and not for the benefit of third parties. Id.; Owner-Operator Indep. Drivers Ass'n v. Concord EFS, Inc., 59 S.W.3d 63, 68 (Tenn. 2001) [hereinafter Owner-Operator]. Nevertheless, a third party may seek to recover under a contract, but the third party bears the burden of proving, from the terms of the contract or the circumstances surrounding its execution, that, *at the time of contracting,* he was an intended third-party beneficiary of the contract. See West, 459 S.W.3d at 46; Owner-Operator, 59 S.W.3d at 68; Moore Constr. Co. Inc. v. Clarksville Dept. of Elec., 707 S.W.2d 1, 9-10 (Tenn. Ct. App. 1985) aff'd 1986 WL 3631, at *1 (Tenn. Mar. 24, 1986); 21 Steven W. Feldman, Tennessee Practice Series, Contract Law and Practice § 3:27 (Database updated Dec. 2016). If the contractual benefits flowing to the third party are merely incidental, rather than intended, the third party may not recover under the contract. Owner-Operator, 59 S.W.3d at 68.

Determining whether a contract was intended to benefit a third party is a matter of contract construction. Oman Constr. Co. v. Tenn. Cent. Ry. Co., 370 S.W.2d 563, 577 (Tenn. 1963). Thus, the usual rules of contract interpretation apply, including the cardinal principle of ascertaining and effectuating the intent of the parties to the contract. Id. at 575-577. Consistent with these general rules, a nonparty may be deemed "an intended third-party beneficiary of a contract . . . entitled to enforce the contract's terms," if:

(1) The parties to the contract have not otherwise agreed;

(2) Recognition of a right to performance in the [third party] is appropriate to effectuate the intention of the parties; and

(3) The terms of the contract or the circumstances surrounding performance indicate that either:

  (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the [third party]; or

  (b) the promisee intends to give the [third party] the benefit of the promised performance.

Owner-Operator, 59 S.W.3d at 70. Part (1) of the foregoing test "honor[s] any expression of intent by the parties to reserve to themselves the benefits of the contract." Id. Part (2) "ensures that third-party beneficiaries will be allowed to enforce the contract only when enforcement would further the parties' objectives in making the agreement." Id. In applying part (2), courts must "look to what the parties intended to accomplish by their agreement" and refuse to grant a nonparty intended third-party beneficiary status if doing so "would undermine the parties' purposes." Id. at 70-71. Part (3) "provides guidance for differentiating between intended and incidental beneficiaries" by "focus[ing] upon the promisee's intent, and not the promisor's." Id. at 71. Subsection (a) of part (3) "focuses upon the promisee's intent to 'discharge a duty . . . to the beneficiary[,]'" and may be applied "even though the duty [the promisee] owed to the beneficiary is not easily convertible into money." Id. As this Court explained in Owner-Operator:

> contracting parties in [part (3),] subsection (a) cases will not necessarily express a direct desire to confer a benefit upon the third party, for the promisee often may be motivated by a self-interested *intent to discharge the duty owed to the third party.* As noted in one California case, "in contracts of [this] type the main purpose of the promisee is not to confer a benefit on the third[-]party beneficiary, but to secure the discharge of his debt or performance of his duty to the third party." Regardless of self-interest, however, a clear expression of intent to discharge a duty owed by the promisee to the third party will satisfy subsection (a).

> Under [part (3),] subsection (b), the analysis more directly centers upon whether the promisee actually intends to confer a benefit upon the third party. Part [(3), subsection] (b) analysis will encompass those [nonparty] beneficiaries who . . . *clearly were intended by the parties to receive the primary benefit of the contract.*

Id. at 71 (emphases added) (citations omitted). Evidence of the promisee's intent to discharge a duty to, or confer a benefit upon, the third party must be clear and direct before the third party may avail himself of the exceptional remedy of recovering on an agreement to which he was not a party. Id. To be deemed an intended third-party beneficiary, all three parts of the foregoing analysis must be satisfied. Id. at 70.

Here, part (1) is satisfied because the parties did not expressly exclude third parties from the benefits of the contract. We need not consider whether part (2) is satisfied in these circumstances, because the undisputed facts fail to establish satisfaction of part (3). At the time of contracting, when third-party status is determined, the undisputed material facts fail to establish that ExtendLife's contractual obligations to the Church[13] were

---

[13] As already noted, ExtendLife and the Church disagree as to what the physician oversight program entailed, with ExtendLife arguing that its obligations were described in the 2008 email, while the Church asserts that ExtendLife's obligations were described by the 2012 enclosure. We reiterate that

intended to "satisfy an obligation or discharge a duty" the Church owed to Mr. Wallis. Id.

### 1. Statutory Duties

Like many states,[14] Tennessee has adopted statutes intended to increase the availability of AEDs, see Tenn. Code Ann. §§ 68-140-401 et seq., and the aim of these statutes is "[to] minimize the number of deaths from sudden cardiac arrest," Hudson v. Town of Jasper, No. M2013-00620-COA-R9CV, 2013 WL 5762224, at *4 (Tenn. Ct. App. Oct. 22, 2013) (citing Tenn. Gen. Assemb., H.B. 2970, 100th Gen. Assemb., Reg. Sess. (Tenn. 1998)). Importantly for purposes of the issue in this appeal, however, Tennessee's AED statutes only *encourage* businesses and other entities to acquire and make AEDs available for use in emergency situations. They do not impose any mandatory duty on businesses to do so,[15] nor do they mandate that businesses use AEDs after they are acquired. See Tenn. Code Ann. §§ 68-140-401, -409. To the contrary, after an AED is acquired, statutory prerequisites must be satisfied "[i]n order for [the] entity to use or allow the use of [the AED]." Id. § 68-140-404; see also Hudson, 2013 WL 5762224, at *4 (stating that Tennessee statutes make "clear that the mere acquisition" of AEDs does not authorize an entity "*to use or allow the use* of its AEDs"

---

these factual disputes are not material to the dispositive issue in this appeal, which is whether the *Church* had a duty to Mr. Wallis to acquire an AED, make it available for use, or use it, which duty the *Church* intended to satisfy by its contract with ExtendLife. See Rye, 477 S.W.3d at 251 (explaining that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" and stating that "disputes that are irrelevant or unnecessary will not be counted" (alteration in original) (citations omitted)). We conclude that the Church owed no such duty, so factual disputes about ExtendLife's contractual obligations to the Church are not material to the resolution of this appeal.

[14] For a comprehensive discussion of the origin, purposes, and current status of AED statutes in other states, see Verdugo v. Target Corp., 327 P.3d 774, 777-79 (Cal. 2014).

[15] Some states have enacted statutes requiring certain entities, such as health care facilities or schools, to acquire and make AEDs available for use. See Verdugo, 327 P.3d at 793 n.23 (collecting state statutes requiring an AED in a fitness studio); id. at 793 n.24 (collecting state statutes requiring an AED on school premises); id. at 794 n.25 (listing states that statutorily require an AED in some public recreation facilities); id. at 794 n.26 (listing state statutes that require an AED in some government buildings); id. at 794 n.27 (listing an Oregon statute that requires an AED in a "place of public assembly"). The Tennessee General Assembly has not enacted a statute mandating any entity to acquire an AED, but it has enacted a statute that encourages local school agencies, "within existing budgetary limits, to place [AEDs] in schools." Tenn. Code Ann. § 49-2-122(a) (2016). Schools that receive AEDs must comply with the statutory prerequisites set forth in Tennessee Code Annotated section 68-140-404. Id. § 49-2-122(b). At least one court has held that even when a statute mandates acquisition of an AED, the statute does not impose a duty on the entity to use the statutorily mandated AED. Miglino v. Bally Total Fitness of Greater N.Y., Inc., 985 N.E.2d 128, 132 (N.Y. 2013).

and that statutes mandate "additional steps . . . prior to such use of an AED" (emphasis in original)).  These post-acquisition statutory prerequisites relate to training, maintenance, registration, and program development, all of which must be accomplished in compliance with rules adopted by the Tennessee Department of Health.  See Tenn. Code Ann. §§ 68-140-404, -405, -408.  Furthermore, if an entity acquires an AED and complies with these statutory prerequisites, the entity receives statutory immunity from civil liability for negligent acts or omissions arising from use of an AED, although this immunity does not extend to willful or wanton misconduct or gross negligence.  Id. § 68-140-406.  In summary, while Tennessee statutes encourage entities to acquire AEDs and make them available for use, these statutes do not impose any affirmative or mandatory duty on businesses to do so, nor do these statutes mandate use of AEDs that are acquired.  Furthermore, businesses that acquire AEDs, comply with statutory prerequisites, and use AEDs receive immunity from liability for negligence.  Accordingly, at the time of contracting, the Church had no statutory duty to Mr. Wallis to acquire and make an AED available for use, nor did the Church have a statutory duty to use the AED it had already acquired.[16]

## 2. Common Law Duties

We next consider whether, under the common law, the Church owed Mr. Wallis a duty to acquire and make an AED available for use at BX or to use the AED it had acquired.  To answer this question, we begin with the well-established principle, that, "[w]hile individuals have an obligation to refrain from acting in a way that *creates* an unreasonable risk of harm to others, the law generally does not impose on individuals an affirmative duty to aid or protect others."  Downs ex rel. Downs v. Bush, 263 S.W.3d 812, 819 (Tenn. 2008) (emphasis added) (citations omitted).  "As a means of mitigating the harshness of the common law rule, exceptions have been created for circumstances in which the defendant has a special relationship with either the individual who is the source of the danger or the person who is at risk."  Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009) (citing Lindsey v. Miami Dev. Corp., 689 S.W.2d 856, 860 (Tenn. 1985)).  One of these "long-recognized special relationship[s] . . . is that between a business owner and patron."  Cullum v. McCool, 432 S.W.3d 829, 833 (Tenn. 2013) (citing 2 Dan B. Dobbs, The Law of Torts § 324 (2008 Supp.); 65A C.J.S. Negligence § 650 (2013)).  Tennessee courts have turned to section 314A of the Restatement (Second) of Torts and decisions from other jurisdictions to define the scope of the duty to render aid created by such special relationships.  See Lindsey, 689 S.W.2d at 859-60 (discussing this duty in the context of social hosts and guests); Kirksey v. Overton Pub, Inc., 804 S.W.2d 68, 78 (Tenn. Ct. App. 1990) (discussing this duty in the context of businesses and customers on their premises).  Generally, this duty requires a

---

[16] Although our holding is based on the statutory language effective in 2008, at the time of contracting, the statutory language has not changed, so Tennessee AED statutes still do not impose any affirmative duty on businesses to acquire and make an AED available for use or to use an AED that has been acquired.

business entity to take reasonable action to protect or aid a patron who sustains injury or becomes ill on business premises.  Lindsey, 689 S.W.2d at 859-60; see also Cullum, 432 S.W.3d at 833.

> [A business entity] is not required to give aid to one whom he has no reason to know to be ill.  [A business entity] will seldom be required to do more than give such first aid as [it] reasonably can, and take reasonable steps to turn the sick person over to a doctor or to those who will look after him until one can be brought.

Lindsey, 689 S.W.2d at 859 (citations omitted).  And business entities "are not required to give aid to persons whom they have no reason to know to be ill or injured or whose illness or injury does not appear to be serious or life-threatening."  McCammon v. Gifford, No. M2001-01357-COA-R3-CV, 2002 WL 732272, at *4 (Tenn. Ct. App. 2002) (citing Restatement (Second) of Torts § 314A cmt. e).  Furthermore, a business entity's "duty to render aid does not extend to providing all medical care that a business could reasonably foresee might be needed by its patrons or to provide the sort of aid that requires special training to administer."  Id. (internal citations omitted); see also Richardson v. Contemporary Serv. Corp., No. 3:12-cv-01278, 2013 WL 3976629, at *3 (M.D. Tenn. 2013) ("Tennessee courts have recognized both an exception to the general rule that no duty exists to render aid and a limitation to the exception: A business has a duty to take reasonable steps to seek medical aid for a customer it knows or should know is injured on its premises, but not if a [competent] person has already taken charge of the customer at the time the business learns of the injury.").

In this case, Mrs. Wallis seeks to recover based on a theory that the Church's duty to render aid to her husband included utilizing an AED.  We agree that the special relationship exception applies here, because Mr. Wallis was a patron of BX.  However, no Tennessee court has previously considered whether a business entity's duty to aid and protect its patrons requires it to acquire and make an AED available for use or to use an AED that has already been acquired.  The only Tennessee appellate case to discuss AED acquisition and use did not involve the issue of duty, as it is presented in this appeal.  See Hudson, 2013 WL 5762224, at *4.[17]

The law in other jurisdictions concerning the duty of business entities to render aid and the acquisition and use of AEDs is still developing.  See generally Jay M. Zitter, Annotation, Liability Arising out of Availability or Use of Automated External

---

[17] The issue in Hudson was whether Tennessee's AED statutes create a private right of action. Hudson, 2013 WL 5762224, at *3.  In holding that the AED statutes afford no private right of action, the Court of Appeals pointed out that certain statutory prerequisites must be satisfied before an AED is used, stating that the "mere acquisition of an AED [does] not authorize [the entity] to use or allow the use of its AEDs; to the contrary, additional steps [are] mandated prior to such use of an AED."  Id. at *4 (emphasis omitted).

Defibrillator or Other Defibrillator Device, 2 A.L.R. 7th Art. 5 (2015). Although our research has revealed no other case in which a lawsuit has been brought against the seller of an AED, we note that every state appellate court to consider the issue has held that the common law duty a business entity owes to patrons does not require a business to acquire and make an AED available for use. Verdugo v. Target Corp., 327 P.3d 774, 794 (Cal. 2014) (applying California law); L.A. Fitness Int'l v. Mayer, 980 So. 2d 550, 559 (Fla. Dist. Ct. App. 2008); Boller v. Robert W. Woodruff Arts Ctr., Inc., 716 S.E.2d 713 (Ga. Ct. App. 2011); Salte v. YMCA of Metro. Chicago Found., 814 N.E.2d 610, 615 (Ill. App. Ct. 2004); Rutnik v. Colonie Ctr. Court Club Inc., 672 N.Y.S.2d 451, 453 (N.Y. App. Div. 1998). Furthermore, research reveals that a majority of appellate courts, and particularly those in jurisdictions that, like Tennessee, apply section 314A of the Restatement (Second) of Torts, have held that even after a business acquires an AED, the business's common law duty to render aid to patrons does not include use of the AED. Abramson v. Ritz Carlton Hotel Co., LLC, 480 F. App'x 158, 161-62 (3d Cir. 2012) (applying New Jersey law); Goins v. Family Y, 757 S.E.2d 146, 148 (Ga. Ct. App. 2014); O'Gwin v. Isle of Capri-Natchez, Inc., 139 So. 3d 783, 787-90 (Miss. Ct. App. 2014); DiGiulio v. Gran, Inc., 952 N.E.2d 1064, 1064 (N.Y. 2011).

These decisions are consistent with current Tennessee law and the law of this State at the time of the 2008 contract. As already emphasized, a business is not required to provide all the medical treatment it could reasonably foresee might be needed by its patrons, nor is it required to provide the sort of aid that requires special training to administer. Not only do Tennessee statutes require special training for AED use, see Tenn. Code Ann. §§ 68-140-404(3), -408, interpreting the common law as imposing a duty on businesses to acquire AEDs and make them available for use would be contrary to Tennessee's AED statutes, which encourage, but do not require acquisition, and indeed, specifically disallow use of AEDs until and unless certain statutory prerequisites are satisfied, Hudson, 2013 WL 5762224, at *4; McCammon, 2002 WL 732272, at *4. Accordingly, we hold that the Church had no common law duty to Mr. Wallis to acquire an AED or to make it available for use, or to use it. Accordingly, the Church did not, by its contract with ExtendLife, intend to discharge a duty it owed to Mr. Wallis. And, in the absence of any such duty on the part of the Church, which the contract was intended to satisfy, Mrs. Wallis cannot prevail on her claim that Mr. Wallis was an intended third-party beneficiary of the contract between ExtendLife and the Church. See Owner-Operator, 59 S.W.3d at 68, 70. ExtendLife, therefore, is entitled to summary judgment on Mrs. Wallis's second amended complaint.

### D. The Church's Third-Party Complaint

For the same reason, the undisputed facts entitle ExtendLife to summary judgment on the Church's third-party complaint. In its third-party complaint the Church alleged that ExtendLife would be solely responsible for any judgment entered against the Church based on its failure to comply with the AED statutes, specifically Tennessee Code

Annotated sections 68-140-403, -404, and -408, because, according to the Church, ExtendLife was contractually bound to ensure that it complied with these statutes. Because the Church owed no statutory duty to Mr. Wallis to acquire and make an AED available for use, the Church cannot be held liable for failing to comply with the AED statutes. Furthermore, even if the Church had a duty, ExtendLife would still be entitled to summary judgment on the Church's third-party complaint because the Church did not use its AED when Mr. Wallis collapsed; thus, any noncompliance with statutory prerequisites cannot, as a factual matter, serve as the basis for a judgment against the Church. Absent use of the AED without satisfaction of the statutory prerequisites, no statutory violation could possibly occur. Thus ExtendLife is entitled to summary judgment on the Church's third-party complaint. We note that the trial court has already granted the Church summary judgment on Mrs. Wallis's negligence per se claim based on the holding in Hudson that the AED statutes do not create a private right of action.[18]

ExtendLife also is entitled to summary judgment on the Church's request for indemnity of attorney fees and expenses in defending against Mrs. Wallis's lawsuit. "Tennessee, like most jurisdictions, adheres to the 'American rule' for award of attorney fees." Cracker Barrel Old Country Store, Inc. v. Epperson, 284 S.W.3d 303, 308 (Tenn. 2009) (footnote omitted). Under this rule, "a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." Id. Here, the Church has pointed to no exception to the American rule that would entitle it to indemnification of attorney fees and expenses from ExtendLife.

## IV. Conclusion

For the reasons stated herein, we reverse the judgment of the trial court and remand the case to the trial court for entry of summary judgment in favor of ExtendLife on Mrs. Wallis's second amended complaint and the Church's third-party complaint, and for any further necessary and appropriate proceedings consistent with this decision. Costs of this appeal are taxed equally to Mrs. Wallis and the Church, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[18] The trial court's decision granting the Church summary judgment on Mrs. Wallis's negligence per se claim and denying it summary judgment on her remaining claims is not before us in this appeal, although we recognize that our conclusion that the Church owed no duty to Mr. Wallis to acquire or use an AED likely will be relevant to the resolution of Mrs. Wallis's wrongful death action on remand.