IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 20, 2023 Session

## TERRY RAINWATERS ET AL. v. TENNESSEE WILDLIFE RESOURCES AGENCY ET AL.

Appeal from the Circuit Court for Benton County
No. 20-CV-6    Donald E. Parish, Judge
Jerri S. Bryant, Chancellor
J. Russell Parkes, Judge

_____

## No. W2022-00514-COA-R3-CV
_____

Acting under authorization of subsections (1) and (7) of Tennessee Code Annotated section 70-1-305, officers of the Tennessee Wildlife Resources Agency (TWRA), suspecting violations of wildlife laws, entered onto the Plaintiffs' properties on multiple occasions, seeking to enforce restrictions upon hunting. The TWRA's officers did so without a warrant or consent. The Plaintiffs brought suit, asserting that the statute authorizing these entries is unconstitutional on its face and as applied, and seeking declaratory and injunctive relief as well as nominal damages. A three-judge trial court panel concluded the statute is unconstitutional on its face and granted declaratory judgment and nominal damages. The three-judge panel divided on two issues. One, the majority pretermitted the as-applied constitutional challenge, while the third judge would have found the statute unconstitutional as applied. Two, the majority declined to grant injunctive relief while the third judge would have granted injunctive relief. The Tennessee Wildlife Resources Agency appeals. We conclude the statute is facially constitutional but unconstitutional as applied. We affirm the award of nominal damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part**

JEFFREY USMAN, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, and KENNY W. ARMSTRONG, JJ., joined.

Jonathan Skrmetti, Attorney General & Reporter; Andrée Sophia Blumstein, Solicitor General; and Amanda S. Jordan, Senior Assistant Attorney General, for the appellants, Tennessee Wildlife Resources Agency, Bobby Wilson, Ed Carter, and Kevin Hoofman.

Joshua Windham and Robert Frommer, Arlington, Virginia; and Jack Leonard, Camden, Tennessee, for the appellees, Terry Rainwaters and Hunter Hollingsworth.

**OPINION**

I.

Tennessee Wildlife Resource Agency (TWRA) officers patrol private lands across the State of Tennessee without either warrants or consent, relying on statutory authority found in subsections (1) and (7) of Tennessee Code Annotated section 70-1-305. The TWRA does not create records of all of its agents' entries onto private property and does not provide notice to property owners. Officers enter private property, sometimes conceal themselves thereupon, and look for violations of wildlife laws. In determining which properties to enter to investigate suspected violations of hunting laws, TWRA officers sometimes rely on having previously seen hunters on the property, on word of mouth, or on listening for shots. TWRA officers also enter upon and cross property not under investigation to reach land they intend to investigate. The TWRA indicates its officers investigate property for suspected hunting violations when they have reason to believe that hunting activity is occurring or has occurred. The TWRA does not impose constraints on how often a parcel is entered, what time of day an entry may be made, or how long an officer may remain on private property, and the TWRA does not have written policies for officers to follow when deciding whether to enter private property. The TWRA asserts that its officers have "the statutory authority to go upon any property, outside of buildings, posted or otherwise, in the performance of . . . their duties to enforce wildlife laws."

The TWRA has made multiple entries upon the properties of Messrs. Terry Rainwaters and Hunter Hollingsworth to investigate suspected violations of wildlife laws. The TWRA does not know how many times its agents have entered upon their properties, nor do Messrs. Rainwaters and Hollingsworth know how many times their properties were entered upon by TWRA agents.

Mr. Rainwaters owns several large parcels of property which he uses to farm and hunt. Among the properties in which Mr. Rainwaters has an interest is a 123-acre parcel on Harmon Creek which Mr. Rainwaters leases from his brother.[1] This property has a

---

[1] The undisputed material facts establish that Mr. Rainwaters also owns other properties. One of his properties is 136 acres and encompasses two homes, one of which is his residence. He farms part of this property in a regular and conspicuous manner. This property is accessible through a private gravel path protected by a chained gate and "No Trespassing" signs posted at both the gate and the end of the pathway. His second parcel, on Liberty Road, is 69 acres, fenced all the way around, and accessible through a chained gate with "No Trespassing signs." He also leases an additional 20 acres from the Sandy River Hunting Club. This property is landlocked and accessible only through the private gravel path that services Mr. Rainwaters's 136-acre home property, and is behind a locked gate with posted "No Trespassing" signs and

chained gate with a "No Trespassing" sign at the entrance.

Mr. Rainwaters leases the Harmon Creek farm for hunting purposes. Mr. Rainwaters and his family and friends hunt on his properties. As a safety precaution, Mr. Rainwaters and his guests follow a rule that hunters should know the location of everyone else on the property. Mr. Rainwaters and his guests have never consented to TWRA officers accessing his properties, nor were any warrants to access his properties ever issued. With regard to the entries at issue on appeal, on three occasions in 2017, Kevin Hoofman, an officer of the TWRA, entered onto Mr. Rainwaters's Harmon Creek property to investigate suspected hunting violations. While on Mr. Rainwater's property, Officer Hoofman took photographs.[2] Mr. Rainwaters continues to farm and hunt on his properties. He has, however, curtailed some of his usage, as he has become hesitant to use his properties or invite guests due to fear of surveillance and fear of injuring a TWRA officer. He testified that he felt "exposed" as a result of a loss of privacy on his land.

The aptly named Hunter Hollingsworth owns a large parcel of land, approximately 93 acres crossing Benton and Henry Counties, which he and his guests use for fishing, farming, camping, and hunting.[3] Mr. Hollingsworth hunts on this property alone and with guests, and he also uses the property to spend time alone with his girlfriend. Mr. Hollingsworth's 93-acre parcel of land is landlocked, accessible through a private gravel drive and a gate belonging to his neighbor, and behind a chained gate at the entrance to his property with a "No Trespassing" sign.

Like Mr. Rainwaters, Mr. Hollingsworth did not give the TWRA permission to enter his land, and the TWRA has never obtained a warrant to enter Mr. Hollingsworth's property. Officer Hoofman entered Mr. Hollingsworth's property on December 21, 2016, to investigate deer baiting, and he took photographs. The parties agree that this entry is the sole entry onto Mr. Hollingsworth's property that is relevant to the issues they present on appeal.[4] Mr. Hollingsworth's hunting license was suspended for three years in November

---

a dozen yards of fencing on either side. On appeal, the parties have limited the entries at issue to three entries onto Mr. Rainwaters's Harmon Creek property.

[2] The parties agree that Mr. Hoofman has made other entries onto Mr. Rainwaters's property, including entering the fenced Liberty Road parcel on September 1, 2016, and entering the 20-acre leased parcel as well as the farm. Furthermore, a camera owned by the United States Fish and Wildlife Service was installed on Mr. Rainwaters's property in November 2017 but removed in December 2017. The parties dispute whether these actions were attributable solely to federal authorities, who were also investigating Mr. Rainwaters, or to both federal and state authorities.

[3] Although Mr. Hollingsworth owns other properties, the parties agree that one entry, in December 2016, is relevant for the purposes of appeal.

[4] In addition, TWRA officers entered Mr. Hollingsworth's property in September and November 2017 and informed federal officers of possible violations. Officer Hoofman installed a camera owned by the United States Fish and Wildlife Service on a tree on Mr. Hollingsworth's property on November 30, 2017, cutting a branch to do so. As with the installation of the camera on Mr. Rainwaters's property, the

2018 due to a federal dove baiting offense. Mr. Hollingsworth continues to use the property, but he has curtailed some of his usage, having become hesitant to use his property for fear of surveillance. He fears that officers might be observing him, his girlfriend, or his guests in their private activities, and he has reduced his visits to his land, where he previously more regularly camped and fished.

Messrs. Rainwaters and Hollingsworth ("the Plaintiffs") brought suit against the TWRA and TWRA Executive Director Ed Carter "in his individual capacity." They sought a declaratory judgment that the searches were unconstitutional and that subsections (1) and (7) of Tennessee Code Annotated section 70-1-305, which authorize the objectionable searches, are unconstitutional facially and as applied. They also sought injunctive relief and nominal damages of $1 from Mr. Carter,[5] as well as attorney's fees. In an amendment to the complaint, Bobby Wilson, who succeeded Mr. Carter as TWRA's Executive Director, was added as a defendant "in his individual capacity." We refer to the Defendants as TWRA throughout this opinion except in section VI wherein we address the nominal damage award against Mr. Carter.

The parties filed cross-motions for summary judgment. The Plaintiffs argued that the searches authorized by the statute violate Article I, Section 7 of the Tennessee Constitution, and the challenged statutory provisions are unconstitutional facially and as applied. They asserted that under the undisputed facts they are entitled to summary judgment. The TWRA sought summary judgment on the basis that the Plaintiffs lacked standing, that the claims were speculative and not justiciable, and that the statute was valid facially and as applied to the Plaintiffs. The matter was assigned to a three-judge panel under Tennessee Code Annotated section 20-18-101.

In response to the parties' cross-motions for summary judgment, the three-judge panel rejected the TWRA's justiciability arguments, concluding that the Plaintiffs had standing and that the injury was not speculative for the purposes of declaratory judgment. The panel concluded that Tennessee Code Annotated subsections 70-1-305(1) and (7) are facially unconstitutional and awarded Plaintiffs a declaratory judgment. The panel also awarded nominal damages of one dollar against Mr. Carter. In their majority opinion, two of three judges pretermitted the Plaintiffs' as-applied constitutional challenge and concluded that the Plaintiffs were not entitled to injunctive relief because the court had

---

parties dispute whether the installation of the camera and the entering of the property on December 12, 2017, was attributable solely to federal authorities or to both federal and state authorities. TWRA agents also entered the property several times in December 2017 and January 2018, and Officer Hoofman, in December 2017, entered Mr. Hollingsworth's property and searched his vehicle, and subsequently recorded video footage of Mr. Hollingsworth. TWRA agents again entered Mr. Hollingsworth's farm on September 2, 2018, to investigate baiting, and they recorded videos. The parties dispute whether TWRA officers were acting as federal agents during these entries onto Mr. Hollingsworth's property.

[5] The initial complaint had also sought nominal damages from Mr. Hoofman.

- 4 -

declared the statutory provisions unconstitutional. A third judge filed a separate opinion dissenting from the majority's pretermitting of the as-applied challenge and denial of injunctive relief but otherwise concurring in the majority opinion. The third judge concluded the Plaintiffs should have been granted summary judgment with regard to their as-applied challenge as well as injunctive relief.

The TWRA appeals, contending that there is no justiciable controversy, that the statute is not facially unconstitutional, and that the statute is constitutional as applied to the Plaintiffs. Additionally, the TWRA asserts on appeal that nominal damages are barred by sovereign immunity. The Plaintiffs counter that there is a justiciable controversy, that the statute is unconstitutional on its face, that the statute is unconstitutional as applied, and that the nominal damages award against Mr. Carter in his individual capacity is appropriate. While the Plaintiffs argue in several places in their brief that the case is justiciable because they seek prospective relief, which they in some instances describe as "prospective declaratory and injunctive relief," they do not present an argument on appeal that the trial court erred in granting a declaratory judgment but not injunctive relief. Accordingly, we do not review the trial court's denial of injunctive relief.

## II.

An appellate court's review of "a trial court's summary judgment decision is de novo without a presumption of correctness." *Regions Bank v. Prager*, 625 S.W.3d 842, 849 (Tenn. 2021). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In making this assessment, a court must view the evidence "in a light most favorable to the claims of the nonmoving party, with all reasonable inferences drawn in favor of those claims." *Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019) (quoting *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 286 (Tenn. 2015)). In conducting this review, a Tennessee appellate court makes "a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250.

The parties agree that there are no disputed, material facts, but disagree as to the correctness of the trial court's legal conclusions. This court reviews questions of law de novo. We determine the constitutionality of a statute de novo with no presumption of correctness afforded to the lower court's legal conclusions. *Hughes v. Tennessee Bd. of Prob. & Parole*, 514 S.W.3d 707, 712 (Tenn. 2017). Justiciability issues are likewise generally questions of law reviewed de novo. 5 C.J.S. Appeal and Error § 822 & n.13, 14, 15; *Huggins v. McKee*, 500 S.W.3d 360, 375 (Tenn. Ct. App. 2016) ("Generally, whether a claim is moot involves a question of law that this Court will review de novo.").

## III.

The TWRA argues the trial court erred in concluding this case is justiciable. It asserts that the Plaintiffs' concerns about future trespasses by the TWRA are too "speculative," observing that TWRA agents have not entered the Plaintiffs' lands since September 2018. The TWRA fails to expressly identify in its briefing what justiciability doctrine or doctrines it believes to be unsatisfied. While the TWRA's briefing regarding non-justiciability is thin, we need not tarry on the question of whether its argument is sufficiently developed to avoid waiver. This is because if a case is non-justiciable "the parties cannot confer jurisdiction through waiver or by consent." *Dominy v. Davidson Cnty. Election Comm'n*, No. M2022-00427-COA-R3-CV, 2023 WL 3729863, at *4 (Tenn. Ct. App. May 31, 2023) (citing *Hooker v. Haslam*, 437 S.W.3d 409, 433 (Tenn. 2014) ("Even though neither of the parties raised the question of mootness, the Court was obligated independently to raise the question sua sponte since mootness goes to the Court's jurisdiction.")); *see also, e.g.*, *Wilcox v. Webster Ins., Inc.*, 982 A.2d 1053, 1065 (Conn. 2009) (noting that "[m]ootness . . . is a justiciability doctrine that implicates this court's subject matter jurisdiction; and, thus, cannot be waived and can be raised at any time" (citations omitted)); *cf. Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 167 (Tenn. 2022) (noting that "subject matter jurisdiction cannot be conferred by consent or waiver"). When the TWRA's counsel was asked at oral argument to identify the justiciability doctrines or doctrines under which the Plaintiffs' claims were thought to be deficient, counsel for the TWRA identified ripeness and mootness.

Addressing the basis under the Tennessee Constitution for justiciability limitations on the authority of state courts, the Tennessee Supreme Court has observed the following:

> The Constitution of Tennessee does not expressly define the powers of the Legislative, Executive, or Judicial Branches of government. *Richardson v. Young*, 122 Tenn. 471, 493, 125 S.W. 664, 668 (1909). Thus, while Article III, Section 2 of the United States Constitution confines the jurisdiction of the federal courts to "cases" and "controversies," the Constitution of Tennessee contains no such direct, express limitation on Tennessee's courts' exercise of their judicial power. U.S. Const. art. III, § 2; Tenn. Const. art. I, §§ 1-2; *Miller v. Miller*, 149 Tenn. 463, 484, 261 S.W. 965, 971 (1924) (noting that the Constitution of Tennessee does not contain limitations similar to those in Article III, Section 2).

> Despite the absence of express constitutional limitations on the exercise of their judicial power, Tennessee's courts have, since the earliest days of statehood, recognized and followed self-imposed rules to promote judicial restraint and to provide criteria for determining whether the courts should hear and decide a particular case. These rules, commonly referred to as justiciability doctrines, are based on the judiciary's understanding of the

intrinsic role of judicial power, as well as its respect for the separation of powers doctrine in Article II, Sections 1 and 2 of the Constitution of Tennessee.

Tennessee's courts believed that "the province of a court is to decide, not advise, and to settle rights, not to give abstract opinions." *State v. Wilson*, 70 Tenn. 204, 210 (1879); *see also Gilreath v. Gilliland*, 95 Tenn. 383, 385-86, 32 S.W. 250, 251 (1895); *Prichitt v. Kirkman*, 2 Tenn. Ch. 390, 393 (1875). Accordingly, they limited their role to deciding "legal controversies." *White v. Kelton*, 144 Tenn. 327, 335, 232 S.W. 668, 670 (1921). A proceeding qualifies as a "legal controversy" when the disputed issue is real and existing, *see State ex rel. Lewis v. State*, 208 Tenn. 534, 536-37, 347 S.W.2d 47, 48 (1961), and not theoretical or abstract, *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 192 (Tenn. 2000); *Miller v. Miller*, 149 Tenn. at 474, 261 S.W. at 968; *State ex rel. Lewis v. State*, 208 Tenn. at 538, 347 S.W.2d at 48-49, and when the dispute is between parties with real and adverse interests. *Memphis Publ'g Co. v. City of Memphis*, 513 S.W.2d 511, 512 (Tenn. 1974).

*Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 202-03 (Tenn. 2009).

The application of Tennessee's justiciability doctrines has borrowed from, but is not controlled by, federal precedent. *Parents' Choice Tennessee v. Golden*, No. M2022-01719-COA-R3-CV, 2024 WL 1670663, at *4 (Tenn. Ct. App. Apr. 18, 2024). "Despite the differences between the state and federal constitutions, Tennessee courts have consistently found federal precedents to be helpful in addressing issues of justiciability and have adopted many of the significant components of federal jurisprudence." *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 203 n.3. However,

[w]hile federal precedent has been helpful in addressing questions of justiciability, Tennessee courts are not bound by this precedent, and the entirety of the doctrines as applied by federal courts has never been adopted wholesale into Tennessee law root and branch. To the contrary, the Tennessee Supreme Court has, more than once, interpreted the Tennessee Constitution in a manner that varies from the federal courts' interpretation of justiciability doctrines under Article III of the United States Constitution.

*Rutan-Ram v. Tenn. Dep't of Children's Servs.*, No. M2022-00998-COA-R3-CV, 2023 WL 5441029, at *6 n.6 (Tenn. Ct. App. Aug. 24, 2023). With this understanding in mind, we turn our attention below to each of the justiciability doctrines at issue in the present case, addressing ripeness and mootness. In considering these doctrines, ripeness is the birth of a case and mootness its death.

Turning to ripeness first, "ripeness is peculiarly a question of timing." *State v. Price*, 579 S.W.3d 332, 338 (Tenn. 2019) (quoting *West v. Schofield*, 468 S.W.3d 482, 490 (Tenn. 2015)). "The ripeness doctrine focuses on whether the dispute has matured to the point that it warrants a judicial decision. The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B & B Enterprises of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010). An unripe case needs more time on the vine, not having matured as of yet into a justiciable case.

To determine whether a case is ripe, courts engage in a two-pronged analysis considering (1) whether the issues are ones appropriate for judicial resolution and (2) whether the court's refusal to act will cause hardship to the parties. *West*, 468 S.W.3d at 491. For the first prong, the question is focused on whether there is an existing legal controversy or whether the issue is instead based "on hypothetical and contingent future events that may never actually occur" or occur as anticipated. *Price*, 579 S.W.3d at 338 (quoting *West*, 468 S.W.3d at 491). The second prong looks at the hardship of withholding adjudication. *Id*.

Although the TWRA asserts that the Plaintiffs' case is unripe, it is unclear how it reaches this conclusion or why this would be. The TWRA has already entered upon the Plaintiffs' properties. The TWRA has clearly asserted an understanding that its employees may legally return to the Plaintiffs' properties at times of their own determination as often as they wish and may conceal themselves on the properties without informing the Plaintiffs or keeping records of their entries. The TWRA asserts a legal entitlement to continue to engage in the very actions which the Plaintiffs contend are unconstitutional. The TWRA has expressed no intent to desist in such actions generally and has persisted in such actions as to other property owners. The TWRA has not indicated that it will not again enter the Plaintiffs' properties. The Plaintiffs have modified their behavior in response to concerns about future reentry by the TWRA, and the TWRA asserted at oral argument that, if the Plaintiffs wish to avoid reentry by the TWRA upon their properties, they should desist in hunting thereupon.

Ripeness becomes problematic where the legal issue is predicated upon future conduct that may or may not occur either as anticipated or at all. *B & B Enterprises of Wilson Cnty., LLC*, 318 S.W.3d at 848. Here, the conduct giving rise to the legal controversy has already occurred, as has an injury, and there is a continuing threat of a reoccurrence thereof: this case has plainly been born. *See*, *e.g.*, *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, No. M2022-01786-COA-R3-CV, 2024 WL 107017, at *17 n.8 (Tenn. Ct. App. Jan. 10, 2024) (indicating the appropriateness of a concession as to ripeness as to a claim where "all facts relevant to this claim have in fact already occurred"); *United States v. Kunz*, 68 F.4th 748, 770 (2d Cir. 2023) noting that "because that purportedly improper delegation has already occurred, [the defendant's]

challenge to that aspect of his sentence is ripe"); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 893 (9th Cir. 1986) ("A case is ripe where the essential facts establishing the right to declaratory relief have already occurred."); *Blake v. Cnty. of Kaua'i Plan. Comm'n*, 315 P.3d 749, 762-63 (Haw. 2013), *as amended* (Jan. 8, 2014) (finding claims to be ripe where they are "premised on actions that allegedly have already occurred" or "involve alleged conduct that has already occurred"); *State v. Exxon Mobil Corp.*, 126 A.3d 266, 308 (N.H. 2015) (finding claims to be ripe where the harm "has already occurred").

Flipping to the other end of the continuum of the life of a case, the TWRA also argues that the case has died, having become moot. A case must remain justiciable from its filing until the appellate disposition. *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 203-04. A case becomes moot when the legal controversy has been extinguished, *City of Memphis*, 414 S.W.3d 88, 96 (Tenn. 2013), or it "no longer serves as a means to provide some sort of judicial relief to the prevailing party." *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 204. The Tennessee Supreme Court has recognized mootness exceptions. *Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 651 S.W.3d 907, 912 (Tenn. 2022). A case that is otherwise moot will remain justiciable (1) where it falls within the public interest exception, (2) where the challenged conduct is capable of repetition yet because of short duration evades judicial review, (3) where there are continuing collateral consequences, or (4) where the challenged conduct has ceased as a result of voluntary cessation. *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 204. Each of these exceptions to the mootness doctrine has its own parameters that govern their application.

The TWRA argues that the Plaintiffs' claim is not justiciable because there has not been a recent entry onto the Plaintiffs' properties and because the Plaintiffs cannot show that there will necessarily be any future entries. The argument from the TWRA is essentially that the Plaintiffs' claims are moot due to the TWRA's voluntary cessation of the challenged conduct upon the Plaintiffs' properties.

Generally, voluntary cessation of purportedly illegal conduct does not moot a case. *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 205. This is because courts do not look favorably on "permitting a litigant to cease its wrongful conduct temporarily to frustrate judicial review and then be free to resume the same conduct after the case is dismissed as moot." *Id.* A case in which the offending conduct is voluntarily halted could be moot when it is "absolutely clear that the allegedly wrongful conduct cannot reasonably be expected to recur." *Id.* "[W]hen the party asserting that the case has become moot based on the cessation of its own conduct is a government entity or official, the court may, if justified by the circumstances of the case, require the opposing party to demonstrate why the proceeding should not be dismissed for mootness." *Id*. at 206.

The circumstances of the present case are even less favorable to a finding of mootness than the *Norma Faye Pyles Lynch Family Purpose LLC* case was, wherein the

Tennessee Supreme Court rejected the assertion that the case was moot. *Id.* at 207. In that case, the Tennessee Supreme Court noted the existence of ambiguity in federal law regarding whether the danger of reoccurrence must be as to the same plaintiff or danger of reoccurrence as to another person would suffice for the case to remain justiciable. *Id.* at 207.[6] Addressing the mootness doctrine under the Tennessee Constitution, the Tennessee Supreme Court definitively rejected the same plaintiff requirement with regard to the voluntary cessation exception. *Id.* at 208. The Tennessee Supreme Court determined that "[w]here a governmental entity is likely to resume or continue engaging in the allegedly offending conduct as to others but not the plaintiff, we simply do not believe that voluntary cessation provides an adequate basis for rendering the action moot." *Id.* The Tennessee Supreme Court did, however, caution that "in cases where the conduct is likely to recur as to others but not the plaintiff, Tennessee appellate courts should be particularly mindful of whether other prudential concerns such as those addressed in considering . . . the public interest exception . . . lead to the conclusion that the case should, nevertheless, be dismissed as moot." *Id.*

In the present case, there is a danger of reoccurrence as to the Plaintiffs themselves, and those Plaintiffs are curtailing their behavior in response to this concern. In this case, the TWRA insists that its actions are constitutional. It is undisputed that the TWRA believes TWRA officers have lawful authority "to enter private property without consent or a warrant to enforce Tennessee's wildlife laws in the performance of their duties." It is likewise undisputed that officers have entered the private property of others pursuant to this purported statutory authority and without consent or a warrant since the filing of this case. Even if the TWRA has not entered the Plaintiffs' properties since 2018, it continues to assert its power to do so. The TWRA has asserted a continuing right to enter upon the Plaintiffs' properties. At oral argument, the TWRA suggested that if the Plaintiffs want to keep the TWRA off of their land in the future that they should desist in hunting. The TWRA's actions fall far short of the type of voluntary cessation that would be sufficient to render this case moot. Accordingly, we find no error in the trial court's conclusion that this case is justiciable.

IV.

Turning to the merits of the case, "[a] constitutional challenge to a statute may be either facial or as-applied." *Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020). The Plaintiffs argue the statute is both facially unconstitutional and unconstitutional as applied to them. The trial court found that Tennessee Code Annotated subsections 70-1-305(1)

---

[6] "While the status of federal law with regard to the question of whether the conduct must recur as to the same plaintiff when considering voluntary cessation is surrounded by ambiguity, there is some indication that the same plaintiff requirement is being applied in the context of voluntary cessation as it is with the capable of repetition yet evading review exception." *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 207.

- 10 -

and (7) are facially unconstitutional but pretermitted the Plaintiffs' as-applied constitutional challenge. A third judge, in his separate opinion, indicated that he would have also found the statute unconstitutional as applied.

On appeal, the TWRA argues that the trial court erred by finding the statutory measures to be facially unconstitutional and also contends the statute is constitutional as applied to its entries upon the properties of the Plaintiffs. The Plaintiffs argue in support of the trial court's facial unconstitutionality ruling and also contend that the TWRA's actions were unconstitutional as applied under the circumstances of the present case.

In this section, we address the Plaintiffs' facial constitutional challenge. Arguing that Tennessee Code Annotated subsections 70-1-305(1) and (7) are facially constitutional, the TWRA notes that the challenged statutory provisions allow for entry upon wild waste land areas beyond the reach of any constitutional protection against searches under Article I, Section 7 of the Tennessee Constitution. *See generally Welch v. State*, 289 S.W. 510, 511 (1926) (concluding that Article I, Section 7 of the Tennessee Constitution does "not include wild or waste lands, or other lands that were unoccupied"). Accordingly, even if the other applications of the statutory measures are unconstitutional, the TWRA asserts that application of the statute to wild waste lands is a constitutionally permissible application of the statute. The TWRA contends this constitutional application of the statute prevents the statutory measures from being struck down as facially unconstitutional. The Plaintiffs do not dispute that the statute authorizes entries upon wild waste land areas or that such entries are constitutional under the Tennessee Constitution. Instead, the Plaintiffs argue that applications of the statute to wild waste land areas are immaterial. They assert entries into such areas are immaterial for purposes of facial constitutional analysis because wild waste land areas are not constitutionally protected under the Tennessee Constitution.

For reasons discussed in greater detail below, we conclude that the TWRA has the better of the argument on the question of whether the statute is facially unconstitutional. At the most foundational level, the statute is facially constitutional because there are applications of the statute that are constitutionally permissible. As the TWRA argues and the Plaintiffs do not dispute, the statute can be constitutionally applied to wild waste land areas, which are beyond the protection of Article I, Section 7 of the Tennessee Constitution. Such applications are not immaterial as asserted by the Plaintiffs, but instead critical to why the statute is at least facially constitutional.

The Tennessee Supreme Court has indicated that when advancing "a facial challenge, the plaintiff contends that there are no circumstances under which the statute, as written, may be found valid." *Fisher*, 604 S.W.3d at 396-97. In contrast, in advancing an as-applied constitutional challenge, the plaintiff is asserting that "the statute is unconstitutional as construed and applied in actual practice against the plaintiff under the facts and circumstances of the particular case" rather than "under some set of hypothetical circumstances." *Id*. at 397. Given the scope of claim advanced in a facial constitutional

challenge, the challenger in such a suit bears "an especially heavy legal burden." *Id*. at 398. To prevail upon a facial challenge, "the challenger must establish that no set of circumstances exist under which the Act would be valid." *Id*. (quoting *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn. 2006)). That is, it must be shown that the statute is unconstitutional "in all applications." *Jackson v. HCA Health Servs. of Tennessee, Inc.*, 383 S.W.3d 497, 500 (Tenn. Ct. App. 2012); *see, e.g.*, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (stating that "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *Carlson v. Simon*, 888 N.W.2d 467, 471 n.3 (Minn. 2016) (citation omitted) ("The challenger who asserts a claim of facial unconstitutionality must prove that the legislation is unconstitutional in all applications."); *Oliver v. Cleveland Indians Baseball Co. P'ship*, 915 N.E.2d 1205, 1210 (Ohio 2009) ("In order for a statute to be facially unconstitutional, it must be unconstitutional in all applications."); *Democratic Nat'l Comm. v. Bostelmann*, 949 N.W.2d 423, 425 (Wis. 2020) (noting that "a facial challenge under Wisconsin law cannot succeed unless the law is unconstitutional in 'all applications'" (quoting *Serv. Emps. Int'l Union, Loc. 1 v. Vos*, 946 N.W.2d 35, 62, 68 (Wis. 2020)).

In wrestling with this standard in the context of a Fourth Amendment facial challenge in the *City of Los Angeles, California v. Patel* case,[7] United States Supreme Court justices diverged over what exactly is required to show unconstitutionality in all applications. The challenged local ordinance in *Patel* required hotel operators to turn over for inspection by police officers all records the hotels were required to keep regarding guests.[8] Writing for the majority, Justice Sotomayor explained that "all applications" is

---

[7] 576 U.S. 409 (2015).

[8]

Los Angeles Municipal Code (LAMC) § 41.49 requires hotel operators to record information about their guests, including: the guest's name and address; the number of people in each guest's party; the make, model, and license plate number of any guest's vehicle parked on hotel property; the guest's date and time of arrival and scheduled departure date; the room number assigned to the guest; the rate charged and amount collected for the room; and the method of payment. § 41.49(2). Guests without reservations, those who pay for their rooms with cash, and any guests who rent a room for less than 12 hours must present photographic identification at the time of check-in, and hotel operators are required to record the number and expiration date of that document. § 41.49(4). For those guests who check in using an electronic kiosk, the hotel's records must also contain the guest's credit card information. § 41.49(2)(b). This information can be maintained in either electronic or paper form, but it must be "kept on the hotel premises in the guest reception or guest check-in area or in an office adjacent" thereto for a period of 90 days. § 41.49(3)(a).

Section 41.49(3)(a)—the only provision at issue [in the *Patel* case]—states, in pertinent part, that hotel guest records "shall be made available to any officer of the Los Angeles

assessed with an inquiry that only considers "applications of the statute in which it actually authorizes or prohibits conduct." *Patel*, 576 U.S. at 418. Where statutes "do no work," such circumstance should not be considered an application because it is not an "actual application[] of the statute." *Id*. at 419. In other words, if the statute permits governmental action that is only permissible based upon some other external authorization, then that circumstance is immaterial, as the challenged statute is not doing any actual work. *Id*. at 418-19. The external authorizations doing the actual "work" in *Patel* of permitting the examination of the hotel records were the well-established doctrinal warrant exceptions, not the local ordinance. *Id*. at 417-19. The challenged local ordinance could not be applied in the absence of circumstances rendering applicable an established exception to the warrant requirement.

In concluding that facial challenges should be assessed in this manner, at least in the context of Fourth Amendment challenges, a significant consideration in the majority's analysis was that allowing the potential applicability of established warrant exceptions that are not within the scope of the language of the statute itself to be considered an application of the statute would effectively nullify any facial challenge for violating the Fourth Amendment. *Id*. at 417-18. The *Patel* majority concluded that embracing established warrant exceptions as relevant constitutionally permissible applications of the statute provides "logic [that] would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches." *Id*. at 418. In a dissenting opinion, Justice Alito took issue with the majority's approach to assessing facial challenges. *Id.* at 441-45 (Alito, J. dissenting). Therein, he asserted that the majority's approach runs contrary to the general distinction between facial and as-applied challenges. *Id*. at 441, 444-45. He concluded that the majority's approach would lead to improper invalidation of statutory provisions that are perfectly constitutional as applied in circumstances where a warrant exception would enable the ordinance to be constitutionally given effect. *Id*. He contended the majority's approach would produce collateral damage to statutory measures in response to facial constitutional challenges that are overreaching. *Id*. at 444.

Both the TWRA and the Plaintiffs have proceeded in litigating this case with an assumption that the majority approach from *Patel* governs in the present case, diverging only in their arguments applying the standard set by *Patel* to the present case. We fail to see why the *Patel* majority approach would necessarily govern. No Tennessee appellate court has adopted the majority's formulation of facial challenges from the *Patel* case. The question of how facial constitutional challenges should be assessed where a constitutional challenge is brought in a Tennessee state court and where the challenger raises a claim under the Tennessee Constitution is a matter in which federal precedent is persuasive rather than mandatory authority.

---

Police Department for inspection". . . .

*Patel*, 576 U.S. at 412-13.

- 13 -

Ultimately, it is unnecessary to determine in the present case whether the majority approach in *Patel* is consistent with how Tennessee courts assess facial challenges under the Tennessee Constitution. It is unnecessary because even under the more challenger-friendly approach of the majority in *Patel*, Tennessee Code Annotated subsections 70-1-305(1) and (7) are not facially unconstitutional. This is so for two reasons. One, there is a critical foundational difference between the statutory measures at issue in the present case and the warrant exceptions that were disregarded as relevant applications under the majority's analysis in *Patel*. Two, in the words of the *Patel* Court, the statute in the present case performs "work." We discuss both reasons below.

With regard to the foundational difference, the *Patel* Court was concerned that a contrary approach for assessing facial constitutional challenges under the Fourth Amendment would render all such challenges nullities because the search warrant exceptions could always provide a basis for permissible application of any statute allowing for searches and seizures. For example, any statute authorizing warrantless searches could be constitutionally applied if the person searched consented to the search, which would be a constitutional application of the statute in circumstance where the consent exception was applicable. Therefore, under the approach employed in Justice Alito's dissent, the *Patel* majority reasoned that no search statute could be facially unconstitutional. The papers at issue in *Patel* were constitutionally protected, but in the present case, Tennessee Code Annotated section 70-1-305 authorizes both searches of properties that fall within the ambit of protections Article I, Section 7 and properties that are beyond the scope of the protections of the Tennessee Constitution. There was no constitutional application of the statute in *Patel* without the presence of an external, that is outside the statute itself, warrant exception.

On the other hand, the statute at issue in the present case, as written, authorizes at least some governmental action which is undisputedly constitutionally permissible. As noted by the TWRA, the statute is constitutional as written when it is applied to wild waste lands. The Plaintiffs assert application to wild waste lands should be disregarded because such entries are constitutionally permissible in the absence of the statute. The Plaintiffs' argument flips the logic of *Patel* on its head. To decline to consider the statute's authorization to conduct constitutionally permissible searches runs contrary to the fundamentals of how facial challenges function under Tennessee law. That the application of the statute to a particular type of real property is constitutionally permissible is not a basis for disregarding the statute's application to that unprotected property when considering whether the statute is facially constitutional.

Adhering to the Plaintiffs' approach, the Court would be declaring the statute wholly unconstitutional, including as to entries upon wild waste lands, which both parties agree the statute authorizes and which both parties agree is a constitutionally permissible authorization. Such an approach runs contrary to the concept to what a facially

- 14 -

unconstitutional statute is. A facially unconstitutional statute is declared unconstitutional in all applications. It is entirely unclear, when considering separation of powers limitations, on what basis a court could invalidate constitutionally permissible applications of the statute at issue in the present case.

As noted above, the Tennessee Supreme Court indicated that in a facial constitutional challenge "the plaintiff contends that there are no circumstances under which the statute, as written, may be found valid." *Fisher*, 604 S.W.3d at 396-97. This standard is simply not satisfied in the present case because there are "circumstances under which the statute, as written, may be found valid," notably in being carried out in wild waste lands.

Furthermore, as noted above, Tennessee Code Annotated subsections 70-1-305(1) and (7), in the language of the *Patel* Court, perform "work." *See Patel*, 576 U.S. at 419. While the Plaintiffs contend that the statutory measures do no work because searches upon wild waste lands are not unconstitutional under the Tennessee Constitution, they have failed to grapple with the potential statutory illegality of such entries by employees of the TWRA in the absence of statutory authorization. Tennessee criminal law provides that "[a] person commits criminal trespass if the person enters or remains on property, or any portion of property, without the consent of the owner." Tenn. Code Ann. § 39-14-405(a). Insofar as TWRA agents may act in contravention of prohibitions upon trespass, Tennessee Code Annotated subsections 70-1-305(1) and (7) appear to provide a source of lawful authority to engage in this conduct. Additionally, Tennessee Code Annotated subsection 70-1-305(1) permits entry upon "any property" even properties that are "posted." *See* Tenn. Code Ann. § 39-14-405(c)(1) (stating that statutory defenses to criminal trespass are not applicable if the owner posts signs visible at all major points of ingress and reasonably likely to come to the attention of those seeking to enter).

Asked at oral argument if Tennessee Code Annotated subsection 70-1-305 might authorize conduct that otherwise would be trespass, the Plaintiffs argued that Tennessee Code Annotated section 70-6-101 already empowered the TWRA to enter upon these lands. It does not appear, however, that Tennessee Code Annotated section 70-6-101 can bear the weight put upon it by the Plaintiffs.[9] Tennessee Code Annotated section 70-6-101(a) provides as follows:

> The executive director or the officers of the wildlife resources agency, or
> officers of any other state or of the federal government who are full-time

---

[9] The Plaintiffs' argument regarding Tennessee Code Annotated section 70-6-101 is also rather perplexing in the sense that if this statutory measure provides for the same authorization as Tennessee Code Annotated subsections 70-1-305(1) and (7) as to authorizing entries upon property, then it is unclear what purpose is served by the Plaintiffs' lawsuit which has challenged Tennessee Code Annotated subsections 70-1-305(1) and (7) but not Tennessee Code Annotated section 70-6-101.

wildlife enforcement personnel designated by the executive director, shall enforce all laws now enacted or that may hereafter be enacted for the propagation and preservation of all wildlife in this state, and shall prosecute all persons, firms and corporations who violate any of such laws. The executive director or officers of the agency shall seize any and all wild animals, wild fowl, wild birds, fishes, frogs and other aquatic animal life, or parts of such wildlife, that have been killed, caught, or taken at a time, in a manner or for a purpose, or that are in possession, or that have been shipped, transported, carried or taken in this state or brought into this state from another state, contrary to the laws of this state.

This statutory measure, unlike Tennessee Code Annotated section 70-1-305(1), lacks any express reference to authorization for the TWRA to enter upon private property.

Assuming for purposes of argument the statute could be read in the manner suggested by the Plaintiffs,[10] there would still be multiple deficiencies under *Patel*. That is, there would still be applications where Tennessee Code Annotated subsections 70-1-305(1) and (7) do "work" that is not accomplished by Tennessee Code Annotated section 70-6-101. *See Patel*, 576 U.S. at 419. For example, as noted by the Plaintiffs themselves in their briefing and as is supported by the record, the TWRA enters upon the property of non-hunters pursuant to Tennessee Code Annotated subsections 70-1-305(1) and (7) as part of its enforcement activities. Tennessee Code Annotated section 70-6-101 states that "[i]t is the duty of every person participating in taking or possessing wildlife as permitted by this title to permit the executive director or officers of the agency to ascertain whether the requirements of this title are being faithfully complied with, including the possession of a proper license." Tenn. Code Ann. § 70-6-101(b)(1). This requirement imposes no obligation upon non-hunters to cooperate with TWRA agents. Furthermore, Tennessee Code Annotated section 70-6-101 is predicated upon requiring cooperation by hunters with the TWRA. *Id.* However, the TWRA contends that Tennessee Code Annotated subsections 70-1-305(1) and (7) empower its officers to engage in concealed entry and to remain on property without any notice to the property owner for limitless time periods without disclosure. This is not an approach predicated upon cooperation by hunters.

For the reasons discussed above in this section, we conclude that Tennessee Code Annotated subsections 70-1-305(1) and (7) are not facially unconstitutional and the trial court erred in concluding to the contrary.

V.

---

[10] Tennessee Code Annotated section 70-6-101(c) states that "[t]his section does not permit search or inspection of a person's dwelling, place of business, or interior of an automobile without a search warrant."

- 16 -

Turning to the Plaintiffs' as-applied constitutional challenge, the TWRA argues that no violations of the Tennessee Constitution occurred. It offers two reasons. One, the TWRA contends that the Plaintiffs' properties, which it notes are used for recreational purposes, are not protected under Article I, Section 7 of the Tennessee Constitution. In support of this contention, the TWRA characterizes the Plaintiffs' properties as wild waste lands rather than "possessions." Because the Plaintiffs' properties are constitutionally unprotected, the TWRA asserts, no searches for purposes of Article I, Section 7 of the Tennessee Constitution occurred; accordingly, no unconstitutional searches occurred. Two, the TWRA argues that, even if searches did occur, any such searches were reasonable and hence constitutional. The Plaintiffs counter by asserting that their properties are protected as "possessions" under Article I, Section 7 of the Tennessee Constitution; therefore, the TWRA's actions constitute searches. Furthermore, the Plaintiffs argue that the searches conducted by the TWRA were unreasonable.

For reasons discussed in greater detail below, we conclude that the Plaintiffs' properties constitute "possessions" protected under Article I, Section 7 of the Tennessee Constitution; consequently, the TWRA's actions constitute searches. Additionally, we conclude that the searches conducted by the TWRA were not reasonable under the Tennessee Constitution. Accordingly, the challenged statutory provisions are unconstitutional as applied to the Plaintiffs.

A.

In addressing the Plaintiffs' as-applied constitutional challenge, we begin with considering whether their properties fall within the scope of the protections afforded by Article I, Section 7 of the Tennessee Constitution. The Tennessee Constitution prohibits unreasonable searches, declaring:

> That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. art. I, § 7.

Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect persons, houses, and papers. U.S. Const. Amend IV; Tenn. Const. art I, § 17. There is, however, a significant textual variance in terms of the scope of protection between these two constitutional provisions. Whereas the Fourth Amendment protects effects, the framers of all three versions Tennessee Constitution, including the current version, rejected protecting effects in favor of protecting

- 17 -

possessions.[11]

Though both terms, "effects" and "possessions," share a property focus, the term "possessions" generates a more expansive shield of constitutional protection than safeguarding "effects." While James Madison initially proposed a formulation that would have included "their other property," "effects" is what was ultimately included in what would become the Fourth Amendment to the United States Constitution.[12] The United States Supreme Court has noted that "[t]he Framers would have understood the term 'effects' to be limited to personal, rather than real, property."[13]

In rejecting "effects" in favor of "possessions," the Tennessee Supreme Court observed that "the word 'possessions' was added for a purpose." *Welch v. State*, 289 S.W. 510, 510 (Tenn. 1926); *see also Allison v. State*, 222 S.W.2d 366, 366 (Tenn. 1949). Drawing upon "the ordinary meaning ascribed to it by lexicographers," the Tennessee Supreme Court indicated that "possessions" "refers to property, real or personal, actually possessed or occupied." *Welch*, 289 S.W. at 510. In support of this definition, the Court drew upon a variety of definitional sources, stating the following:

> The word "possession" is thus defined in Webster's Unabridged Dictionary: "The having, holding, or detention of property in one's power or command."

> "Actual possession" is thus defined in 31 Cyc. 926, to wit:

> "That possession which exists where the thing is in the immediate occupancy of the party. Applied to land, the actual exercise by the owner of the present power to deal with the estate and exclude other persons from meddling with it; and actual and continuous occupancy or exercise of full dominion, and this may be either, first, an occupancy in fact of the whole that is in possession, or, second, an occupancy of part thereof in the name of the whole; a subjection to the will and dominion of the claimant, usually evidenced by occupation, by a substantial inclosure, cultivation, or by appropriate use; and

---

[11] Tenn. Const. Article I, Section 7 (1870); Tenn. Const. Article I, Section 7 (1834); Tenn. Const. Article XI, Section 7 (1796); *see also* Connor D. McDonald, *It Just Means More: Why Tennessee Should Maintain the Tennessee Open Fields Doctrine and Reject the Less Protective Federal Standard*, 10 Belmont L. Rev. 106, 130 (2022) (noting that "[a]lthough Tennessee adopted the current version of the Tennessee Constitution in 1870 following the Civil War, the text of Article 1, Section 7 can be traced verbatim back to the first Constitution of Tennessee, adopted in 1796").

[12] "James Madison originally proposed that the Fourth Amendment protect 'persons,' 'houses,' 'papers,' and '*their other property*.' The language of 'other property' was replaced with 'effects' by the House Committee of the Eleven charged with revising the draft of the Constitution." Andrew Guthrie Ferguson, *The Internet of Things and the Fourth Amendment of Effects*, 104 CAL. L. REV. 805, 827 (2016).

[13] *Oliver v. United States*, 466 U.S. 170, 177 n.7 (1984).

as much consists of a present power and right of dominion as an actual corporeal presence."

In 3 Words and Phrases, Second Edition, 1100, it is said:

"The ordinary meaning of the word 'possession' is the same as 'occupancy.'"

In the same book, on page 1102, it is said:

"That the words 'property, possessions, of estates' are sufficient if not qualified to carry real estate, is well settled by many decisions."

*Id.* at 510-11. In interpreting possessions in connection with actual possession, the Tennessee Supreme Court drew upon a longstanding distinction between legal ownership, for example by title, and entry upon property accompanied by acts of ownership.[14] While an expansive concept, "possessions" is not unlimited; in particular, possessions "would not include wild or waste lands, or other lands that were unoccupied." *Welch*, 289 S.W. at 511.

In determining whether lands qualify as possessions, Tennessee courts have considered whether the area was inhabited,[15] whether it was fenced,[16] whether there was signage indicating an intent to maintain the owner's privacy,[17] the state of the vegetation

---

[14] *See*, *e.g.*, *Possession*, Black's Law Dictionary 914 (1st ed. 1890) (describing actual possession of real property as "[i]t is actual where the party goes upon the land to take possession and exercises acts of ownership over it" in contrast to constructive possession which "is where one claims to hold by virtue of some title"); *see also*, *e.g.*, Noah Webster, *Possession*, The American Dictionary of the English Language (1828) ("[t]he having, holding or detention of property in one's power or command; actual seizin or occupancy . . . ."); *Possession*, Oxford English Dictionary ("1.b. *Law.* Visible power or control over something (defined by the intention to use or to hold it against others) as distinct from lawful ownership; *spec.* exclusive control of land (in early use sometimes in the technical sense of seisin n.).");  John Bouvier, *Possession*, A Law Dictionary (Rev. 6th ed. 1856) (drawing a distinction between actual and constructive possession with actual occurring through occupancy and constructive arising by "virtue of some title").

[15] *State v. Harris*, 919 S.W.2d 619, 621 (Tenn. Crim. App. 1995); *State v. Smith*, No. 03C01-9109CR00279, 1992 WL 46840, at *1, 5 (Tenn. Crim. App. Mar. 12, 1992) ("It certainly does not seem to be uninhabited.").

[16] *Allison*, 222 S.W.2d at 366; *Welch*, 289 S.W. at 510; *Harris*, 919 S.W.2d at 624 ("Nothing authorized [the officers] to peer in windows or prowl around, private, occupied, fenced property."); *State v. Dunham*, No. CCA 01C019002CR00041, 1990 WL 165796, at *3-4 (Tenn. Crim. App. Nov. 1, 1990); *State v. Doelman*, 620 S.W.2d 96, 98 (Tenn. Crim. App. 1981) (noting that "[t]he proof did not show that the farm was fenced or posted").

[17] *State v. Casteel*, No. E1999-00076-CCA-R3-CD, 2001 WL 329538, at *18 (Tenn. Crim. App. Apr. 5, 2001); *Harris*, 919 S.W.2d at 621; *Dunham*, 1990 WL 165796, at *4.

or plant life on the property,[18] whether the property was occupied by domestic animals,[19] the method by which it was accessible,[20] and whether the property was in use.[21] Tennessee has a robust history of protecting land outside the curtilage of a home as a "possession" under Article I, Section 7 of the State Constitution. *See*, *e.g.*, *Lakin*, 588 S.W.2d at 546 (land located down a path to a farmhouse, past a shed, up a path a quarter of a mile up a hill to a barn and garden, and then 50-100 feet further was constitutionally protected); *Allison*, 222 S.W.2d at 366 (enclosed woodlot used as pasture a half mile from the home was constitutionally protected); *Welch* 289 S.W. at 510 (one-acre lot, which was fenced, used for confining livestock, and located more than 300 yards from the defendant's home was constitutionally protected); *State v. Casteel*, No. E1999-00076-CCA-R3-CD, 2001 WL 329538, at *18 (Tenn. Crim. App. Apr. 5, 2001) (land which had "No Trespassing" signs, on which the defendant was camping, and as to which he repeatedly threatened trespassers who sought to enter was constitutionally protected although there was no dwelling and it was not farmed); *Smith*, 1992 WL 46840, at *1, 5-6 (overgrown one- to three-acre back yard containing sheds and fenced chicken house was constitutionally protected); *Dunham*, 1990 WL 165796, at *4 (15-acre tract which was fenced, bush-hogged, used for livestock and farm animals, and posted was constitutionally protected); *compare Chico*, 394 S.W.2d at 650 (honeysuckle thicket some distance from the house and its enclosures was not constitutionally protected); *Doelman*, 620 S.W.2d at 99 ("In this case the record fails to show that the land traversed by Winborn prior to discovering the marijuana field was occupied, enclosed, cultivated, or in actual use by the appellants.").

At the very core of constitutional safeguard against unreasonable searches is the

---

[18] *State v. Lakin*, 588 S.W.2d 544, 546 (Tenn. 1979); *Allison*, 222 S.W.2d at 366 (pasture land); *Harris*, 919 S.W.2d at 621 (land is mowed and used for gardening); *Smith*, 1992 WL 46840, at *3, 5 (finding the area was not wild and waste land, although it was overgrown, because "[o]ne should have the same constitutional protections whether his yard mowing habits are good or bad"); *Dunham*, 1990 WL 165796, at *4; *Doelman*, 620 S.W.2d at 99 (land not cultivated); .

[19] *Welch*, 289 S.W. at 510; *Harris*, 919 S.W.2d at 621; *Smith*, 1992 WL 46840, at *3; *Dunham*, 1990 WL 165796, at *4.

[20] *Lakin*, 588 S.W.2d at 546; *Harris*, 919 S.W.2d at 621 (down a private lane).

[21] *Lakin*, 588 S.W.2d at 547 (near a barn and garden which were "apparently in use"); *Casteel*, 2001 WL 329538, at *18 (defendant's act of repeatedly threatening trespassers with firearms demonstrated his attempt to occupy the land); *Smith*, 1992 WL 46840, at *5 (the defendant's family "used this area although it had grown up with underbrush"); *Doelman*, 620 S.W.2d at 99 (land not in actual use). We note here that the TWRA argues that the Plaintiffs' lands were not in "daily" use. This argument appears to stem from language in *Chico v. State* that land "not possessed as a part of the curtilage or used in the daily operation of the premises, then the constitutional provision against unreasonable searches and seizures does not apply." 394 S.W.2d 648, 651 (Tenn. 1965). In *Chico*, the court upheld a search which took place in "a honeysuckle patch some distance back of the house." *Id*. at 650. TWRA's reading of this decision is too literal and would, for example, remove safeguards for farmland where crops are harvested in the fall and fields left fallow before the next crop planted in the spring or even much shorter periods of dormancy.

home.[22]  As under the Fourth Amendment to the United States Constitution,[23] the term houses in the Tennessee Constitution includes the curtilage.  *Welch*, 289 S.W. at 511 (noting that "the word 'houses,' in our [(Tennessee)] Constitution, would include the 'curtilage'"); *see also* 4 W. Blackstone, *Commentaries on the Laws of England* 225 (1769) ("[T]he capital house protects and privileges all its branches and appurtenants, if within the curtilage").  With regard to real property, the importance of the protection of "possessions" under the Tennessee Constitutions comes into play when one when moves beyond the home and its curtilage.  *Welch*, 289 S.W. at 511.

When considering uses of real property other than as a home, there is nothing in the Tennessee Constitution that suggests a lesser regard for uses of property more common in rural areas than those more typical of urban or suburban areas.  The key is actual use, and the Tennessee Constitution does not disfavor actual uses more commonly associated with rural areas.  The undisputed facts here demonstrate that the Plaintiffs occupied and actually possessed — within the constitutional meaning of the term possessions — the properties at issue.  Their lands were secured by gates, accessible only through private drives, and posted with "no trespassing" signs intended to limit access to them.  The Plaintiffs used and occupied their land by farming, fishing, camping, and hunting.  The Plaintiffs' assertion that their properties qualify under Article I, Section 7 as possessions are not claims relying merely upon legal title but instead upon visible actions of actual possession and occupation of the property, that is, engaging in entry and acts of ownership thereupon.  The TWRA concedes that recreational uses were going on in the areas searched, especially hunting and fishing, and they note that such suspected usage is precisely the reason the TWRA entered upon these properties.  While the TWRA endeavors to dismiss hunting, fishing, and camping upon one's property as recreational in nature, such activities, recreational though they may be, constitute actual use of the property.  The TWRA suspected that these actual uses were occurring and that suspicion resulted in the TWRA's entry upon the Plaintiffs' properties.  We conclude that these were not wild or waste lands outside the shield of Article I, Section 7 of the Tennessee Constitution but instead "possessions" subject to constitutional protection.

B.

The TWRA argues that even if the Plaintiffs' properties are possessions constitutionally protected under Article I, Section 7 of the Tennessee Constitution, any searches did not constitute constitutional violations because the searches were reasonable.

---

[22] *See, e.g.*, *Kyllo v. United States,* 533 U.S. 27, 31 (2001) (stating that "'[a]t the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *State v. Hatchie*, 166 P.3d 698, 703 (Wash. 2007) (indicating that "a citizen's privacy is most protected in his or her home").

[23] *See, e.g.*, *United States v. Dunn*, 480 U.S. 294, 300 (1987).

As expressly noted by the trial court, the TWRA has not endeavored to defend its searches based upon any of the established exceptions to the warrant requirement. On appeal, the TWRA instead argues that the searches are reasonable because the Plaintiffs "have voluntarily subjected themselves and their private property to inspection and regulation." The Plaintiffs respond by noting that the TWRA did not argue, and actually expressly disclaimed, any implied consent theory in defense of its actions before the trial court. In its reply, the TWRA again disclaims any implied consent argument and instead emphasizes the reasonableness of the searches performed by the TWRA in connection with their purpose and scope. Insofar as the TWRA's briefing (despite protestations) is asserting an implied consent theory, that theory is waived.

The TWRA's further argument on appeal as to the reasonableness of its actions is a two-part assertion. One, the TWRA contends its agents are enforcing wildlife protection laws. Two, "TWRA officers enter private property only when—and only in areas where— they believe hunting activity is taking place or has taken place."

Without the existence of any established search warrant exception (again the TWRA has not argued any are applicable in this case), the TWRA asserts that government agents may enter upon constitutionally protected property without disclosing their presence or retaining a record of their having done so, conceal themselves thereupon for a time period deemed appropriate by the government agents themselves, and search the property for violations of wildlife laws. The TWRA contends that this is reasonable because the officers limit themselves to circumstances where they believe that hunting activities are taking place.

As the Tennessee Supreme Court has oft noted, "warrantless searches and seizures are presumptively unreasonable." *See, e.g., State v. Hamm*, 589 S.W.3d 765, 771 (Tenn. 2019) (noting that the presumption of unreasonableness applies "regardless of whether law enforcement actually had probable cause to conduct a search"); *State v. McElrath*, 569 S.W.3d 565, 570 (Tenn. 2019); *State v. McCormick*, 494 S.W.3d 673, 679 (Tenn. 2016). Reasonableness is the ultimate touchstone, and despite the general presumption, "there are circumstances where the reasonableness standard of . . . article I, section 7 requires neither probable cause nor a warrant." *State v. Stanfield*, 554 S.W.3d 1, 9 (Tenn. 2018). The Tennessee Supreme Court has described the exceptions to the warrant requirement as "a few specifically established and well-delineated exceptions[,] jealously and carefully drawn." *McElrath*, 569 S.W.3d at 570 (quoting *State v. Turner*, 297 S.W.3d 155, (Tenn. 2009)). However, as noted above, the TWRA is not arguing that any established exceptions to the warrant requirement are applicable in the present case. Rather, the TWRA is contending that its searches are reasonable because its agents are enforcing wildlife laws and its agents enter and search property only when they suspect that hunting activities are occurring.

This argument is unavailing. The TWRA's argument runs contrary to the

- 22 -

foundations of the protections against unreasonable searches and seizures in the American legal tradition. This is, perhaps, most clearly seen when one considers the colonial era *Paxton*'s Case, also known as the Writs of Assistance Case. To understand that case, which brought together an intersection of issues related to economic liberty, privacy, and restraints upon arbitrary power, context is helpful.

With concerns about war with France looming and in search of revenue, the British decided upon stricter enforcement of their mercantilist trade regulation and taxes in the American colonies.[24] In Boston, the economy depended upon illegal trade, including smuggling, which was backed by widespread support of local residents.[25] In moving forward with stricter enforcement by customs officers, the British officials dusted off The Act of Frauds of 1662 and The Act of Frauds of 1696, which made the former applicable to the colonies.[26] The Act of Frauds of 1662 authorized customs officials "to enter, and go into any House, Shop, Cellar, Warehouse or Room, or other Place, and in Case of Resistance, to break open Doors, Chests, Trunks and other Package, there to seize, and from thence to bring, any Kind of Goods or Merchandize whatsoever, prohibited and uncustomed."[27] The power to act was upon a custom officer's own suspicion, and the customs officer was empowered to make use of Writs of Assistance.[28] Writs of Assistance were

> a simple directive in the form of a document in the name of the king that "ordered a wide variety of persons to help the customs man make his search." Writs were not issued as a result of any information that contraband was stored at a specified place; instead, the customs officials could search wherever they chose. "The discretion delegated to the official was therefore

---

[24] William J. Stuntz, *The Substantive Origins of Criminal Procedure*, 105 Yale L.J. 393, 404-05 (1995). Mercantilist theory in Britain "held that Colonies existed primarily to benefit the mother country." James W. Ely, Jr., *Economic Liberties and the Original Meaning of the Constitution*, 45 San Diego L. Rev. 673, 676 (2008). The Navigation Acts imposed trade restrictions with goods imported to the Colonies being required to pass through England and most of the raw materials the Colonies sought to export being required to be shipped to England. *Id.* at 677. However, well into "the middle of the eighteenth century, enforcement of the various Navigation Acts in the American colonies remained lax and inconsistent." Aaron T. Knapp, *From Empire to Law: Customs Collection in the American Founding*, 43 Law & Soc. Inquiry 554, 559 (2018). Despite the intentions of the mercantile system, a thriving trade had developed between the American colonies and French West Indies as to molasses, which in turn was distilled into rum and grog; the Molasses Act of 1733 was an attempt to ensure that trade was instead with the British West Indies. *Id.* at 561-63. For a multitude of reasons, the Molasses Act was generally evaded through various means, including smuggling by American colonials. *Id.*

[25] Knapp, *supra* note 24, at 561-63; *see also* Stuntz, *supra* note 24, at 404-05.

[26] Stuntz, *supra* note 24, at 404.

[27] *Id.* at 404 (quoting Act of Frauds § 5(2) (1662)).

[28] The Honorable M. Blane Michael, *Reading the Fourth Amendment: Guidance from the Mischief That Gave It Birth*, 85 N.Y.U. L. Rev. 905, 907-08 (2010).

practically absolute and unlimited." The writs were akin to "permanent search warrants placed in the hands of custom officials: they might be used with unlimited discretion and were valid for the duration of the life of the sovereign."[29]

However, with the death in 1760 of King George II and ascension of King George III, custom officials would need to apply for the issuance of new Writs of Assistance.[30] With stricter enforcement proving controversial in Boston, well-regarded Massachusetts lawyer James Otis took a case on behalf of a number of Boston merchants and citizens in opposing the issuance of new writs to the customs collectors.[31]

Arguing forcefully in opposition to the custom officers' searches, one of the "overarching themes" of Otis's argument was "the inevitability of abuse when government officials have the sort of unlimited discretion sanctioned by the writ of assistance."[32] Otis argued the above-discussed approach to searches "places the liberty of every man in the hands of every petty officer" and was thus "the worst instrument of arbitrary power, the most destructive of English liberty . . . that ever was found in an English law-book."[33] His legal argument offered opposition to officers searching and seizing at their own discretion.[34] Terming the customs officials "petty tyrants," Otis posed the question "can a community be safe with an uncontroul'd power lodg'd in the hands of such officers. . .?"[35]

---

[29] Thomas K. Clancy, *The Importance of James Otis*, 82 Miss. L.J. 487, 492-93 (2013) (first quoting M.H. Smith, *The Writs of Assistance Case* 29 (1978), then quoting Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 54 (1937), then quoting Jacob B. Landynski, *Search and Seizure and the Supreme Court* 31 (1966)).

[30] Craig A. Stern & Gregory M. Jones, *The Coherence of Natural Inalienable Rights*, 76 UMKC L. Rev. 939, 992 n. 238 (2008) (quoting Scott Liell, *46 Pages: Thomas Paine, Common Sense, and the Turning Point to American Independence* 18-19 (2003)).

[31] Michael, 85 N.Y.U. L. Rev. at 908 (observing that "Otis's advocacy in this case . . . galvanized support for what became the Fourth Amendment").

[32] *Id*. at 908-09

[33] Clancy, *supra* note 29, at 509 (quoting 10 *The Works of John Adams* 524-25 (Charles F. Adams ed., 1856)); John M. Burkoff, *"A Flame of Fire": The Fourth Amendment in Perilous Times*, 74 Miss L.J. 631, 638 (2004) (quoting *Boyd v. United States*, 116 U.S. 616, 625 (1886)).

[34] *See*, *e.g.*, Clancy, *supra* note 29, at 508 (noting that Otis "emphasized the uncontrolled discretion of the customs officials"); Raymond Shih Ray Ku, *The Founders' Privacy: The Fourth Amendment and the Power of Technological Surveillance*, 86 Minn. L. Rev. 1325, 1335 (2002) (stating that "concern over discretion was clearly a central argument in James Otis's argument against the writs"); Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review*, 77 B.U. L. Rev. 925, 969 (1997) (indicating that a critical concern of Otis was with the discretion afforded to customs officials).

[35] Clancy, *supra* note 29, at 508-09 (quoting Josiah Quincy, Jr., *Reports of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Massachusetts Bay, Between 1761 And 1772* 494 (1865)).

He argued instead in favor of special warrants, which "may be granted on oath and probable suspicion," and he added "an officer should show probable grounds, should take his oath on it, should do this before a magistrate, and that such magistrate, if he think proper should issue a special warrant to a constable to search the places."[36] In the absence thereof, he noted that "bare suspicion without oath is sufficient."[37] Given the absence of judicial review, Otis stated of the writs that "these monsters in the law live forever" and "no one can be called to account."[38] Though he had no written constitution to reference, Otis argued that the writs were unconstitutional and hence void.[39]

No member of the five-member Massachusetts Superior Court was persuaded; they voted unanimously to issue the requested writs of assistance.[40] His arguments though would find an audience beyond the members of the Superior Court. Writing of the experience of hearing Otis's arguments, John Adams, who had been sitting in the courtroom, observed

> Otis was a flame of fire! . . . Every man of a crowded audience appeared to me to go away, as I did, ready to take arms against writs of assistance. Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born. In fifteen years, namely in 1776, he grew up to manhood, and declared himself free.[41]

"Otis's arguments were widely repeated throughout the colonies"[42] or at least "similar arguments were raised throughout the colonies."[43] These arguments began to find traction with legislatures and judges as resistance increased to the British approach to searches.[44] As states formulated their initial state constitutions, a number of states utilized language in

---

[36] *Id.* at 510 (quoting Letter from John Adams to William Tudor (Feb. 25, 1818), *in* 10 *The Works of John Adams* 524-25 (Charles F. Adams ed., 1856)).

[37] *Id.* (quoting 2 *The Works of John Adams* 524-25 (Charles F. Adams ed., 1856)).

[38] Against the Writs of Assistance (1761), reprinted in M.H. Smith, *supra* note 29, at 554.

[39] *Id.*

[40] Michael, *supra* note 28, at 909.

[41] Letter from John Adams to William Tudor (Mar. 29, 1817), reprinted in 10 *The Works of John Adams* 247-48 (Charles F. Adams ed., 1856).

[42] William Baude, James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1838 (2016).

[43] Tracey Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. & Mary L. Rev. 197, 224 (1993).

[44] *Id.* at 223-28; Maclin, *supra* note 34, at 947.

line with the concerns voiced by James Otis.[45]  Significantly, John Adams would draft Article XIV of the Massachusetts Constitution, incorporating Otis's ideas therein.[46]  "Otis's arguments in the Writs of Assistance Case had a profound . . . influence on Adams."[47]  The Massachusetts Constitution in turn became the model for the Fourth Amendment to the United States Constitution.[48]

The United States Supreme Court has observed that "[t]he Founding generation crafted the Fourth Amendment as a 'response to the reviled "general warrants" and "writs of assistance" of the colonial era . . . .'"  *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)).  The United States Supreme Court has also pointed to Otis's opposition thereto as an initial act of opposition to the arbitrary exercise of British authority and a spark of Independence.[49]  Addressing the Fourth Amendment, the Tennessee Supreme Court observed that "[t]he purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions [by] government[al] officials.'"  *State v. Christensen*, 517 S.W.3d 60, 68 (Tenn. 2017) (quoting

---

[45] *See, e.g.*, Robert M. Bloom, *Warrant Requirement -- the Burger Court Approach*, 53 U. Colo. L. Rev. 691, 695 (1982) ("A number of early state constitutions reflected the sentiment against writs of assistance.  These constitutions focused primarily on excluding general warrants.  In their place most of the constitutions provided for special warrants which required specificity and probable cause."); Orin S. Kerr, *Katz As Originalism*, 71 Duke L.J. 1047, 1068 (2022) (stating that "Otis's arguments against the legality of the writs were influential and understood to have helped inspire the adoption of search and seizure protections in state constitutions"); John V. Orth, *Reconstructing the Fourth Amendment: A History of Search and Seizure, 1789-1868. by Andrew E. Taslitz. New York: NYU Press, 2006*, 10 New Crim. L. Rev. 315, 315 (2007) ("The abuses that led to the adoption of the Amendment had occurred during the colonial period: 'general warrants' and 'writs of assistance,' authorizing officers to search anyone, anytime, for evidence of any crime.  The various state constitutions adopted after the Revolution almost invariably forbade the practices . . . .").

[46] *Carpenter v. United States*, 585 U.S. 296, 349-50 (Thomas, J., dissenting) (noting that "John Adams attended Otis' argument and later drafted Article XIV of the Massachusetts Constitution, which served as a model for the Fourth Amendment"); Leonard W. Levy, *Origins of the Fourth Amendment*, 114 Pol. Sci. Quarterly 79, 85 (1999) ("Adams's reaction to Otis's speech is so important because a straight line of progression runs from Otis's argument in 1761 to Adam's framing of Article XIV of the Massachusetts Declaration of Rights of 1780 to James Madison's introduction of the proposal that became the Fourth Amendment.").

[47] Thomas K. Clancy, *The Framers' Intent: John Adams, His Era, and the Fourth Amendment*, 86 Ind. L.J. 979, 1052 (2011).

[48] Donald A. Dripps, *Responding to the Challenges of Contextual Change and Legal Dynamism in Interpreting the Fourth Amendment*, 81 Miss. L.J. 1085, 1103-04 (2012) (noting the influence of Otis upon Adams and observing that "John Adams would go on to draft Article 14 of the Massachusetts Declaration of Rights, the primary model for the Fourth Amendment"); Luke M. Milligan, *The Forgotten Right to Be Secure*, 65 Hastings L.J. 713, 742 (2014) )("The Massachusetts clause, authored by John Adams, emerged as the model for the federal Amendment on searches and seizures.").

[49] *See*, *e.g.*, *Carpenter*, 585 U.S. at 303-04; *Riley*, 573 U.S. 373, 403 (2014).

*Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). The Tennessee Supreme Court has also indicated that Article I, Section 7 of the Tennessee Constitution "imposes limits on search and seizure powers in order to prevent arbitrary interference by the police with the privacy and personal liberty of individuals." *State v. Downey*, 945 S.W.2d 102, 104 (Tenn. 1997). The requirement of obtaining "a warrant ensures that the inferences to support a search are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" *Riley*, 573 U.S. at 382 (citation omitted); *see also*, *e.g.*, *Schmerber v. California*, 384 U.S. 757, 770 (1966); *State v. Tuttle*, 515 S.W.3d 282, 300 (Tenn. 2017).

Considered in the relation to the circumstances of the present case, what the TWRA is arguing is reasonable stands in opposition to the restraint upon unreasonable searches and seizures that emerged from the American colonial era in opposition to arbitrary British search practices. Under what the TWRA purports to be a reasonable search, each agent is empowered with the discretionary authority to determine for himself or herself if there is a reasonable basis to suspect hunting activities are occurring on the property. The TWRA does not notify the property owners of its entries or keep records thereof. How often and for long and whether their entry is concealed or not are matters of discretion for the TWRA agents to decide for themselves. There is no clear system of judicial review that allows consideration of the TWRA's entries upon private property or their agents' comportment thereupon. Even in the present case where these entries have been brought to the attention of the court through the Plaintiffs' suit, the TWRA has not endeavored to support each of their entries with an individualized showing of sufficient basis to justify each specific entry. Instead, the TWRA asserts that their approach is systematically reasonable because its officers only search if they conclude that they have a reasonable belief that hunting is occurring or has occurred.[50] The TWRA searches, which it claims are reasonable, bear a marked resemblance to the arbitrary discretionary entries of customs officials more than two centuries ago in colonial Boston.

The TWRA's contention is a disturbing assertion of power on behalf of the government that stands contrary to the foundations of the search protections against arbitrary governmental intrusions in the American legal tradition, generally, and in Tennessee, specifically. Simply stated, given the purpose of Article I, Section 7 of preventing arbitrary intrusions upon privacy and personal liberty, what the TWRA claims is reasonable is not.

For the reasons discussed above in this section, we conclude that Tennessee Code Annotated subsections 70-1-305(1) and (7) are unconstitutional as applied.

VI.

---

[50] The TWRA also does not articulate why reasonable suspicion rather than probable cause is the appropriate standard.

With regard to the nominal damage award, in their Second Amended Complaint, the Plaintiffs named as a defendant Ed Carter, "former Executive Director of Tennessee Wildlife Resources Agency, in his individual capacity" and sought "an award of $1 in nominal damages against Defendant Carter in his individual capacity." The trial court granted this requested relief. As part of its ruling, the trial court stated "Plaintiffs are awarded one dollar ($1.00) in nominal damages for their constitutional injury, which Defendant Carter is ORDERED to pay." On appeal, the Defendants argue this award of nominal damage violates sovereign immunity. Specifically, the Defendants assert that because "Defendant Carter was sued as the then-executive director of the TWRA, the award of nominal damages against him reaches 'the state, its treasury, funds, or property'; accordingly, the award of damages is barred by sovereign immunity."

The Plaintiffs argue that they have pursued an action against former Director Carter in his personal capacity, seeking to recover one dollar in nominal damages from his personal assets. They contend that sovereign immunity would only bar a suit seeking reimbursement from the State itself and that they sought recovery individually from Mr. Carter personally as to the nominal damage award. That is precisely how the trial court entered its order, noting "Defendant Carter is ORDERED to pay" the one dollar in nominal damages. The Defendants argue that that collection from the state treasury violates sovereign immunity. The Defendants do not address the personal capacity versus official capacity distinction asserted by the Plaintiffs. They do not argue that Mr. Carter is not subject to suit, or was improperly sued, in his personal capacity.

It is unnecessary for this court to address the Defendants' argument in opposition to the nominal damage award on appeal. We conclude that the Defendants' argument has been waived. Additionally, we note that the Defendants' argument is non-responsive to the trial court's decision in which the nominal damage judgment is imposed against Mr. Carter in his individual capacity.

It is unsurprising that the trial court did not address the argument advanced by the Defendants on appeal, as the Defendants did not raise this argument before the trial court. "[I]ssues not raised in the trial court cannot be raised for the first time on appeal." *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 898 (Tenn. 2016) (quoting *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991) and citing *Dye v. Witco Corp.*, 216 S.W.3d 317, 321 (Tenn. 2007) (holding that "issues raised for the first time on appeal are waived" (quoting *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996)))). Nowhere in the Defendants' briefing before the trial court did they contend that a nominal damage award against Mr. Carter, much less a nominal damage award granted pursuant to a suit against Mr. Carter naming him in his personal capacity, would violate sovereign immunity.[51] The Defendants raised a sovereign immunity argument in their Motion to

---

[51] As to monetary damages, the Defendants argued in support of their Motion to Dismiss that "To

Dismiss but did not address therein monetary damages, including nominal damages, and only raised sovereign immunity in their defense of the TWRA, not of Mr. Carter.

This failure to raise sovereign immunity as to Mr. Carter did not go unnoticed by the Plaintiffs. In responding to the Defendants' sovereign immunity argument as to the TWRA in their Motion to Dismiss, the Plaintiffs observed the following:

> Defendants make no argument that Defendants Carter and Hoofman enjoy sovereign immunity. This makes sense, as *Colonial Pipeline [Co. v. Morgan]* forecloses that argument. *See* 263 S.W.3d [827,] 853 [(Tenn. 2008)] (holding that sovereign immunity does not apply in suits for "declaratory and injunctive relief against [officers] in their individual capacity, so long as the court's judgment is tailored to prevent the implementation of unconstitutional legislation and does not" seek state money or property).

The Defendants did not express before the trial court any disagreement with this characterization of their argument or the Plaintiffs' characterization of Tennessee law on this matter.

The Defendants also did not raise in their motion for summary judgment the contention that they advance on appeal in addressing nominal damages or sovereign immunity. Nor did they include any argument regarding sovereign immunity protecting against monetary damages as a response to the Plaintiffs' Motion for Summary Judgment, which sought one dollar in nominal damages from Mr. Carter in his personal capacity. Simply stated, the Defendants did not argue in opposition to the award of nominal damages on the basis that they advance on appeal. We conclude this argument is waived.

VII.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm in part and reverse in part the judgment of the trial court. The costs of the appeal are taxed to the appellants, Tennessee Wildlife Resources Agency, Bobby Wilson, Ed Carter, and Kevin Hoofman, for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this

---

the extent that Plaintiffs are asserting a claim for money damages against the TWRA for violation of the Tennessee Constitution, such claims are without merit because Tennessee does not recognize a private cause of action for violations of the Tennessee Constitution." The Motion to Dismiss did not contain any further argument on or elucidation of this issue. The Plaintiffs opposed the Motion to Dismiss, arguing that relief obtained under Tenn. Code Ann. § 29-14-110(a) "may include the award of damages." *See Paduch v. Johnson City*, 896 S.W.2d 767, 771 (Tenn. 1995). The Motion to Dismiss was denied, with the trial court finding in relevant part that nominal damages may be an appropriate remedy for a violation of constitutional rights.

opinion.

_____
JEFFREY USMAN, JUDGE